## Commonwealth vs. Lionel Rodriguez
### (and a companion case[1]).

Bristol. March 5, 2010. - August 9, 2010.

Present: Marshall, C.J., Ireland, Spina, Botsford, & Gants, JJ.

*Homicide. Jury and Jurors. Constitutional Law,* Jury. *Practice, Criminal,*
Capital case, Empanelment of jury, Challenge to jurors, Instructions to
jury. *Evidence,* Photograph, Expert opinion. *Accessory and Principal.*

At a criminal trial, the Commonwealth's peremptory challenge of the sole
Hispanic member of the venire did not violate the defendant's rights under
the equal protection clause of the Fourteenth Amendment to the United
States Constitution or art. 12 of the Massachusetts Declaration of Rights,
where the prosecutor's reason for challenging the juror was adequate, in
that it was specific to the juror and was unrelated to the fact that she was
Hispanic, and where the circumstances of the challenge demonstrated that
the prosecutor's reason was genuine. [467-474] Marshall, C.J., concur-
ring, with whom Spina, J., joined.

At a murder trial, the judge was under no obligation, sua sponte, to instruct
the jury on an honest but mistaken identification, and no substantial likeli-
hood of a miscarriage of justice arose from the instruction on identification
that the judge gave, which, as a whole, adequately covered the issue, and
which essentially was the one requested by the defendant's counsel and ap-
proved as a model instruction. [474-475]

At a murder trial, the admission of autopsy photographs, together with por-
tions of the testimony from a medical examiner who did not perform the
autopsy and the admission in evidence during his testimony of a chart (cre-
ated by the medical examiner who performed the autopsy) depicting the
victim's external injuries, created a substantial likelihood of a miscarriage
of justice against one of the defendants, where the photographs, which
were admitted without proper foundation, and the improperly admitted por-
tions of the medical examiner's testimony (i.e., his testimony as to the
factual findings of the autopsy report pertaining to the external and internal
injuries to the victim, in part by using information from the chart) took on
great significance in establishing the severity of the assault, as bearing on
whether the murder was committed with extreme atrocity and cruelty, and
were not cumulative of other, admissible evidence [475-481]; however,
where all the necessary elements of murder in the second degree had been
proved beyond a reasonable doubt, this court directed the entry of a verdict
of murder in the second degree [481-482].

This court reversed a defendant's conviction of being an accessory to murder

[1]Commonwealth vs. Ryan Marshall.

before the fact, and set aside the verdict, where there was no evidence that the defendant counselled, hired, or otherwise procured the felony, and where the form of the indictment, while technically compliant with G. L. c. 277, § 79, was not sufficient to charge the defendant with his active participation in, and presence during, the commission of the felony. [482-487]

INDICTMENTS found and returned in the Superior Court Department on March 14, 2001.

The cases were tried before *Robert C. Rufo*, J.

*Kevin S. Nixon* for Lionel Rodriguez.

*Richard J. Fallon* for Ryan Marshall.

*Rachel J. Eisenhaure*, Assistant District Attorney (*Shoshana E. Stern*, Assistant District Attorney, with her) for the Commonwealth.

IRELAND, J. In February, 2006, a jury convicted the defendant Lionel Rodriguez of murder in the first degree on the theory of extreme atrocity or cruelty.[2] His codefendant, Ryan Marshall, was convicted of being an accessory before the fact to that murder also on the theory of extreme atrocity or cruelty.[3] The victim was George R. Carpenter, a longtime friend of Marshall's mother.[4] The defendants, each represented by new counsel on appeal, raise various arguments. Rodriguez argues (1) that the

---

[2]On the charge of murder in the first degree, the Commonwealth also proceeded on the theory of deliberate premeditation, which the jury rejected. In addition to the charge of murder in the first degree, the jury were permitted to consider whether the defendant Lionel Rodriguez committed murder in the second degree, voluntary manslaughter, involuntary manslaughter, assault and battery by means of a dangerous weapon, or assault and battery. On all theories of murder, the Commonwealth proceeded against Rodriguez for causing the death of the victim either individually or as a joint venturer. The verdict did not specify whether the jury found him guilty individually or as a joint venturer.

[3]In addition, the jury were permitted to consider whether Ryan Marshall was an accessory before the fact to murder in the second degree.

[4]Others were indicted for their alleged involvement in the death of George R. Carpenter. Robert Tirado, Orlando Badillo, and Dennis Smith were charged with murder in the first degree, and Jonathan Torres was indicted as an accessory before the fact to murder in the first degree. Tirado and Torres were tried first; Tirado was convicted of murder in the second degree, and Torres was acquitted. After being tried together, both Badillo and Smith were convicted of murder in the second degree. Tirado's conviction was affirmed by the Appeals Court, see *Commonwealth* v. *Tirado*, 65 Mass. App. Ct. 571, 579 (2006), as was (in an unpublished memorandum and order pursuant to its rule

prosecutor improperly used a peremptory challenge to remove the sole Hispanic juror; (2) error in the failure to instruct the jury on an "honest but mistaken" identification as set forth in *Commonwealth* v. *Pressley*, 390 Mass. 617, 619-620 (1983); and (3) error in the admission of autopsy photographs and testimony of the medical examiner. Marshall argues (1) insufficiency of the evidence; (2) that his conviction violated principles of due process; (3) error in the judge's instructions to the jury; and that we exercise our authority under G. L. c. 278, § 33E, to reduce his conviction.[5] We conclude, as to Rodriguez, that errors in the admission of autopsy photographs and testimony of the medical examiner created a substantial likelihood of a miscarriage of justice as to his conviction of murder in the first degree on a theory of extreme atrocity or cruelty, and reduce his conviction to murder in the second degree. Because there was insufficient evidence to sustain Marshall's conviction as an accessory before the fact, we reverse his conviction and set aside the verdict.

1. *Background.* The jury could have found the following facts. On the evening of February 15, 2001, Marshall's mother, Donna Medeiros, met some friends, including Elizabeth Cardona, David Amaral, Tony Ramos, Kevin Rose, and the victim, at a pub in New Bedford. After closing, at about 2 A.M. on February 16, the group went to Medeiros's nearby apartment on Bluefield Street.[6] There, they drank and continued to socialize.

1:28) the order denying his motion for a new trial, *Commonwealth* v. *Tirado*, 73 Mass. App. Ct. 1113 (2009). The consolidated appeal of Badillo and Smith from their convictions and postconviction motions is pending in the Appeals Court.

[5]A defendant convicted as an accessory before the fact to murder in the first degree is entitled to review under G. L. c. 278, § 33E, because it is a capital crime with the same punishment as that for murder in the first degree. See *Commonwealth* v. *Jones*, 432 Mass. 623, 624 n.1 (2000); *Commonwealth* v. *Angiulo*, 415 Mass. 502, 507-510 (1993).

[6]Donna Medeiros's apartment was part of a housing complex. Each building in the complex contained six housing units. Medeiros's apartment was in the middle of the units of her building. She lived in a two-story unit, with a kitchen and living room on the first floor, and three bedrooms and a bathroom on the second floor. The front door to her unit faced in the direction of Matthew Street, which was adjacent to Bluefield Street, and the back door faced in the direction of Dartmouth Street, which essentially ran parallel to Bluefield Street. Marshall, who was then eighteen years of age, lived with his mother in the apartment, having his own bedroom upstairs.

At approximately 2:30 A.M., Marshall came home, accompanied by his girl friend Rebecca Rose[7] and some friends, namely Robert Tirado, Jonathan Torres, and Heather Lawrence. Earlier in the evening, Marshall and Rose had been at Tirado's home, which was part of the housing complex where Marshall lived. While at Tirado's home, other friends of Marshall arrived, including Rodriguez, Torres, Lawrence, Dennis Smith, and Orlando Badillo. At the time, Rodriguez drove a purple Mitsubishi automobile, and Badillo drove a large Ford sport utility vehicle (SUV).

After spending some time at Medeiros's home, Kevin Rose decided to leave, departing through the kitchen door. While waiting outside, he saw the victim, Marshall, Tirado, and "a girl" leave through the kitchen door. The men were arguing.[8] Tirado was upset. He was screaming, ran out in the street, and ripped off his jacket, throwing it to the ground. He then used his cellular telephone.

The victim, accompanied by Ramos, went over to the victim's automobile, a Toyota Camry. The victim got into the driver's seat and Ramos entered the front passenger side. As the victim started to drive away, Tirado pulled out a large knife and slashed the front driver's-side tire of the Camry. The tire went flat. After slowly driving the Camry down the street a short distance, the victim got out of the vehicle and again argued with Tirado.

Ramos opened the trunk of the Camry to get a spare tire. Amaral, who had entered his automobile, got out to assist him.[9] Although the men were able to lift the Camry up on a jack, they were not able to change the tire. Before they could do so, Badillo arrived in his SUV and Rodriguez drove up in his Mitsubishi.[10] Several men stepped out of the vehicles, went over to

---

[7]Because Medeiros's friend Kevin Rose and Marshall's girl friend Rebecca Rose have the same last name, we refer to Kevin Rose by using his full name and to Rebecca Rose as Rose.

[8]There was testimony that both the victim and Tirado were large men.

[9]David Amaral left Medeiros's apartment by the kitchen door with Elizabeth Cardona. As Amaral went to his automobile, Cardona saw Marshall and Medeiros arguing, and stayed behind. Marshall was swearing at his mother, directing her to go back inside the apartment. Although Medeiros heard some commotion outside, she testified that Marshall and Cardona would not let her go outside her home.

[10]Rose made this observation. Kevin Rose testified that one vehicle, a sport utility vehicle, arrived.

the victim, and started hitting him. Neither Amaral nor Kevin Rose was able to see who hit the victim because each was leaving the area. As he was driving away, Kevin Rose looked into his rearview mirror and observed that the victim had fallen to the ground and that a "bunch of men" were "stomping" on him. Once Amaral and Kevin Rose were able, each dialed 911 to report the attack of the victim.

While the victim lay on the ground, Rose observed Tirado repeatedly kick him in the torso area. She saw Marshall twice kick the victim's right leg. She saw Badillo kick the victim in the head. In addition, she saw Smith (who had arrived in Rodriguez's vehicle) and Rodriguez each kick the victim repeatedly. She also saw that the victim was struck with a tire iron, but she did not see who struck him. Rose testified that no one else had been involved and stated that Torres did not strike the victim.[11] She further testified that, although Marshall had attempted to throw a trash barrel on the victim, she had been able to stop him.[12]

When police arrived, they found the victim lying on his back in the street, unconscious and gasping for air. There was blood coming from the back of his head. There was a crowd of about thirty people in the vicinity. Paramedics arrived within minutes and transported the victim to a hospital. He died later that day as a result of acute massive intra-abdominal hemorrhage due to blunt force trauma.[13]

[11]Amaral told police that ten males, who wore hooded sweatshirts, had been involved in beating up the victim. Kevin Rose testified that between four to six people struck the victim. Heather Lawrence asserted her privilege under the Fifth Amendment to the United States Constitution at trial and did not testify.

[12]Rose had lied to the police, saying that she had not seen anything. Then, her mother drove her and Tirado to a hotel "to get away from police." Rose and Tirado stayed there for a couple of days, but subsequently, Rose went to police and told them what she had observed. Also, from photographic arrays, Rose identified Marshall, Rodriguez, Smith, Badillo, and Tirado as having been involved in the beating of the victim.

At trial, Rose testified that she initially lied to police because she feared retaliation. During cross-examination, Rose stated that Lawrence had threatened her in the event that she were to "snitch on" Lawrence. There also was evidence that, while speaking with police, Rose had drawn a diagram of the scene of the beating and on it had written the names of the assailants, but did not place Rodriguez's name on the diagram.

[13]The medical evidence concerning the victim's cause of death came from Dr. Richard John Evans, a medical examiner and forensic pathologist. As will

At approximately 9 A.M. that morning, police went to the Medeiros home and asked to speak with Marshall. Marshall went to a police station with them, where he made a statement that was not recorded. Although Marshall stated that Rose and Tirado had been at his home on February 16, he said that when his mother's friends began to leave, he went upstairs to bed. Shortly later, Marshall went on to explain, Rose woke him, telling him that someone had been beaten up outside. He got up and looked outside the window and saw police vehicles.

Forensic evidence linked Marshall to the beating of the victim. Deoxyribonucleic acid (DNA) testing revealed that blood consistent with the victim's was found on boots worn by Marshall on February 16.

The defendants did not testify. Their trial counsel, through cross-examination, attempted to demonstrate that Rose was a drunk and lying teenager. Based on Rose's testimony, Rodriguez's trial counsel argued that she was a less than credible witness also on account that she helped a murderer (namely, Tirado) flee and hide, and had sexual relations with him while doing do.[14] In addition, the defendants' trial counsel argued that aspects of the police investigation were faulty.

Rodriguez's trial counsel sought to establish a defense of misidentification. He elicited from Medeiros, Amaral, and Kevin Rose that they did not see Rodriguez on February 16, and argued that Rose's identification of Rodriguez was unreliable because although she previously had met him, she did not "know" him. Rodriguez's trial counsel also called two police officers who testified that they had interviewed Kevin Rose after arriving to the scene, and he had not implicated Rodriguez.

Marshall's trial counsel argued that the injuries to the victim allegedly from Marshall did not contribute to the victim's death. The argument derived from testimony Marshall's trial counsel elicited during the cross-examination of the medical examiner, who opined that the abrasions to the victim's knees were not fatal and could not have contributed to the cause of death.

be more fully explained forthwith, Dr. Evans testified in the absence of Dr. Leonard Atkins, the medical examiner who conducted the victim's autopsy.

[14]During cross-examination, Rose admitted to having sexual relations with Tirado.

2. *Discussion.* a. *Rodriguez's appeal.* i. *Peremptory challenge.* All the members of the jury that convicted Rodriguez (who is Hispanic) were white, as was the victim. Rodriguez argues that the prosecutor's peremptory challenge of the sole Hispanic venireperson violated the equal protection clause of the Fourteenth Amendment to the United States Constitution, *Batson* v. *Kentucky*, 476 U.S. 79, 84-89 (1986), and art. 12 of the Massachusetts Declaration of Rights, *Commonwealth* v. *Soares*, 377 Mass. 461, 486-488, cert. denied, 444 U.S. 881 (1979).[15] The issue arose as follows.

The empanelment process occurred over a two-day period. The judge first addressed the venire as a group and then engaged in individual questioning. See *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987), overruled in part on another ground in *Commonwealth* v. *Ramirez*, 407 Mass. 553, 555 (1990) (requiring individual voir dire when requested by defendant and when defendant and victim are members of different racial groups). During the first day of empanelment, the prospective juror in question (juror) was asked, as were all prospective jurors, whether any family member or close friend had ever been accused of, been a witness to, or the victim of a violent crime. The juror stated that her son, who was fifteen years of age, had been caught stealing and was involved with the Juvenile Court in Attleboro.

After asking the juror to step aside, the judge asked whether there was an objection to him discharging the juror for cause. Marshall's trial counsel had no objection, and the prosecutor affirmatively requested that the juror be removed for cause. Counsel for Rodriguez, however, objected because the juror was "the only Hispanic juror." The judge stated that he would explore the matter further and resumed questioning of the juror.

Further questioning of the juror disclosed that her son received one and one-half years of probation and had to pay restitution. Her son was still "on probation" and was dismissed from school as a result of the incident. Although the juror thought that the

---

[15]There is no dispute that Hispanic persons are members of a racial or ethnic group protected under art. 1 of the Declaration of Rights, as amended by art. 106 of the Amendments to the Massachusetts Constitution, see *Commonwealth* v. *Vann Long*, 419 Mass. 798, 807 n.9 (1995), and under the equal protection clause of the Fourteenth Amendment to the United States Constitution. See *Castaneda* v. *Partida*, 430 U.S. 482, 495 (1977).

prosecutor and the police had been fair, she stated that her son was "miserable" and did not "have a life anymore." The juror indicated that she believed that, "if you do a crime, you have to do the time," and that her son was "lucky he got away with just probation." In addition, the juror stated that, a few years ago, she had been assaulted in Boston. She testified against the assailant at his trial, at which he was convicted. The juror indicated that, despite these events in her life involving her son and the assault against her, she would have "no problem" sitting as a juror on a criminal trial and would be able to be fair and impartial. When asked whether she could read English, and if she had recalled checking "none" to a question on a jury questionnaire form asking her whether as a party or as a victim she or any member of her immediate family had any involvement in the past or present in a criminal or civil case, the juror stated that she could read the form, and that when she had been shown a video, "was like, oh man."[16]

The prosecutor then challenged the juror for cause because she failed to state her experience and her son's experience with the court system as called for by the jury questionnaire form. The prosecutor stated, "[I]t would be one thing if she just [had] left [the form] blank and maybe overlooked it, but she [expressly checked] none [after having been expressly asked]."[17] The judge denied the prosecutor's challenge for cause, finding that the juror had not engaged in any deception and "had a reasonable explanation, which was she missed it." The juror was seated.

Subsequently, the prosecutor directed peremptory challenges at five jurors, including the juror in question. Counsel for Rodriguez asked to be heard, but the judge told him to wait until the clerk had refilled the seats. Counsel for Marshall stated that Rodriguez's trial counsel had an issue with the juror, and inquired if she were leaving. The judge remarked, "She's already gone." When Rodriguez's trial counsel was finally given an opportunity to speak, he indicated that he would have objected to the discharge of the juror and explained: "It may be ineffective assist-

---

[16]There is nothing in the record that explains what the juror meant by this statement.

[17]The juror's questionnaire is not available for examination because, like the questionnaires of all potential jurors not seated within the jury, it was destroyed after empanelment pursuant to G. L. c. 234A, § 23.

ance, but I realized it too late that [one of the five challenged jurors] was the juror that was of a Hispanic ethnicity, and I wanted to make a . . . challenge. That's the only Hispanic juror I had." The judge asked the prosecutor if he wanted to be heard. The prosecutor explained:

"Only if your Honor is making a finding that there's been a foundation laid for such a challenge. . . . For the record, I'm not aware that she's the only Hispanic surnamed person in the venire. We haven't gone through the rest of the names. I make note of the fact that the Commonwealth specifically asked that she be excused for cause at the side bar, and based that request on the fact that the jury questionnaire that she filled out, specifically the portion that the court did draw to her attention, that it indicates describe briefly any involvement, past or present, as a party or a victim in a civil or criminal case by you or any member of your immediate family. That she had checked off apparently having read that statement, 'none.' She then proceeded to tell the court both about her victimization in the case in Suffolk County, as well as the fact that her son had been prosecuted by my office in the Juvenile Court in Attleboro. And while I do not believe the court has yet made the foundation to indicate that there is a legitimate question about the challenge, I state for the record that the Commonwealth exercised its peremptory on that basis. Specifically state that it did not make the challenge on any racial grounds whatsoever."

The following exchange then took place:

THE JUDGE: "Do you wish to be heard further on the foundational requirements under the *Soares* decision?"

COUNSEL FOR RODRIGUEZ: "[A]ll I would say at this juncture that it was the only Hispanic juror that I saw seated, that we have seated so far, and just for that reason."

THE JUDGE: "I'm not able to make that finding. I'm not making that finding that's the only 'Hispanic' juror. I have not examined the venire as it currently exists. If you want me to, I will."

COUNSEL FOR RODRIGUEZ: "Judge, I would —"

THE JUDGE: "Beyond that, even if I did make the foundational requirement, based on the explanation that's just been given by the Commonwealth, I'm not inclined to revisit the issue of the peremptory challenge of [the juror]."

Counsel for Rodriguez asked the judge to "note [his] objection." The judge stated, "My ruling is that the peremptory challenge stands." By declining, based on the prosecutor's explanation, to revisit his approval of the peremptory challenge, the judge implicitly found the prosecutor's stated reason to be credible. See *Commonwealth* v. *Benoit*, 452 Mass. 212, 231-232 (2008) (Cowin, J., dissenting). Jury empanelment continued the following day.

"The use of peremptory challenges to exclude prospective jurors solely because of bias presumed to derive from their membership in discrete community groups is prohibited both by art. 12, see *Commonwealth* v. *Soares*, [*supra*], and the equal protection clause, see *Batson* v. *Kentucky*, [*supra*]." *Commonwealth* v. *Harris*, 409 Mass. 461, 464 (1991).[18] "Under these decisions, once the party contesting a peremptory challenge rebuts the ordinary presumption that the challenge was properly used by making a showing of an improper basis for the challenge, the challenging party must provide, if possible, a neutral explanation establishing that the challenge is unrelated to the prospective juror's group affiliation." *Id.*, and cases cited. "Evidence of a pattern of challenges of members of the same discrete group as the defendant is sufficient to rebut the presumption of proper use of challenges." *Id.* In addition, the presumption may be rebutted "by demonstrating that [the defendant] is a member of a constitutionally protected, discrete community group, and that the only prospective juror of the same group has been peremptorily challenged." *Id.* at 466. See *Commonwealth* v. *Fryar*, 414 Mass. 732, 738 (1993), *S.C.*, 425 Mass. 237, cert. denied, 522 U.S. 1033 (1997).

A trial judge should adhere to a certain procedural process in evaluating whether the exercise of a peremptory challenge is

---

[18]The analysis under the State and Federal Constitutions appears to be the same, see *Commonwealth* v. *Benoit*, 452 Mass. 212, 217-218 & n.6 (2008); *Commonwealth* v. *Vann Long*, 419 Mass. 798, 806 (1995), and Rodriguez does not argue to the contrary.

proper. See *Commonwealth* v. *Maldonado*, 439 Mass. 460, 463-466 (2003). Once an issue is raised concerning an improper use of a peremptory challenge, "the judge must make a finding as to whether a prima facie showing of an improper use . . . has been made." *Id.* at 463. We have stressed the importance of this task, noting that "an appellate court must be able to discern from the record whether the preliminary finding has been made, one way or the other." *Id.* at 463 n.5. After the finding has been made, and the burden shifts to the party exercising the challenge to provide a "group-neutral" explanation for it, the judge must "specifically determine whether the explanation is 'bona fide' or a mere 'sham,' 'belatedly contrived to avoid admitting facts of group discrimination.' " *Id.* at 463-464, quoting *Commonwealth* v. *Soares*, *supra* at 491. In so doing, the judge should hear also from the opposing party. *Commonwealth* v. *Maldonado*, *supra* at 464 n.6. The judge should make "specific findings" or provide an "explanation" ascertainable to an appellate court concerning whether the reason for removal offered by the challenging party is both adequate and genuine. *Id.* at 465-466.

"An explanation is *adequate* if it is 'clear and reasonably specific,' 'personal to the juror and not based on the juror's group affiliation,' . . . and related to the particular case being tried." *Id.* at 464-465, quoting *Commonwealth* v. *Burnett*, 418 Mass. 769, 771 (1994). "Challenges based on subjective data such as a juror's looks or gestures, or a party's 'gut' feeling should rarely be accepted as adequate because such explanations can easily be used as pretexts for discrimination." *Commonwealth* v. *Maldonado*, *supra* at 465. "An explanation is *genuine* if it is in fact the reason for the exercise of the challenge." *Id.* The mere denial of an improper motive is insufficient to establish genuineness. *Id.* "An explanation that is perfectly reasonable in the abstract must be rejected if the judge does not believe that it reflects the challenging party's thinking." *Id.*

In this case, the Commonwealth contends that Rodriguez's trial counsel failed to establish a prima facie showing that the peremptory challenge of the juror was improper. Technically, the Commonwealth is correct. However, the judge foreclosed Rodriguez's trial counsel from doing so by refusing him an opportunity to be heard immediately after the challenge was

exercised and when he requested to be heard. In these circumstances, and where Rodriguez's trial counsel earlier had made it clear (when objecting to the prosecutor's attempt to remove the juror for cause) that he objected to the removal of the only Hispanic juror from the venire, it is reasonable to treat the situation as one in which Rodriguez's trial counsel had properly preserved a *Soares-Batson* objection.

We also conclude it is reasonable to treat the situation as one in which Rodriguez's trial counsel had sufficiently rebutted the presumption of propriety. Although Rodriguez's trial counsel was not given the opportunity to specify promptly the nature of his objection, he had earlier made it clear that he objected to the removal of the sole Hispanic juror. Nothing had occurred subsequently that would have influenced him to change his position, that is, there were no other Hispanic jurors seated. When he eventually was permitted to state his objection, Rodriguez's trial counsel restated the same objection he had earlier voiced (that the juror was the sole Hispanic juror), despite the fact that the juror was "already gone." The objection at that point in time was entirely permissible. See *Commonwealth* v. *Harris*, *supra.* That another day of empanelment was (or may be) on the horizon does not foreclose inquiry at the time of the objection, particularly in circumstances where there was no evidence that other Hispanic persons were (or would be) included in the venire. See *id.* at 463-464, 466 n.3 (defendant's decision to not "re-do empanelment" as offered by prosecutor was reasonable in light of fact that there "was no real prospect that there would be any [black persons] in a second venire" and did not bar *Soares* claim). It was only through the judge's haste to empanel a jury that he did not take note of what was obvious.

We now consider whether the prosecutor provided "a neutral explanation establishing that the challenge is unrelated to the prospective juror's group affiliation." *Commonwealth* v. *Harris*, *supra* at 464. While it appears from the judge's statements that he implicitly credited the prosecutor's explanation for exercising the challenge, the judge did not follow the proper procedure and expressly make the requisite finding that, or otherwise expressly explain why, the prosecutor "had met [his] burden of establishing an adequate, race-neutral explanation that was the

genuine reason for the challenge."[19] *Commonwealth* v. *Maldonado, supra* at 466. Consequently, the judge's ruling excluding the juror is not to be accorded any deference. *Id.* See *Commonwealth* v. *Calderon,* 431 Mass. 21, 27 (2000) ("Procedural mistakes in the allowance of a peremptory challenge by the Commonwealth . . . do not constitute a per se basis for reversal"). We must "make our own [de novo] determination whether the Commonwealth's reasons for the challenge were race-neutral." *Id.* See *Commonwealth* v. *Benoit,* 452 Mass. 212, 223 (2008) ("Where the necessary findings by the judge are absent, as an appellate court we must consider more directly the adequacy and genuineness of the prosecutor's stated reasons, rather than confine ourselves to a review of the judge's findings"). We conclude that the prosecutor's challenge was "race neutral" and specific to the juror, and that his explanation for the challenge was adequate and genuine.

The prosecutor's reason for challenging the juror was specific to the juror and was unrelated to the fact that she was Hispanic. The prosecutor made it clear from the outset that he wanted the juror removed for cause based on the juror's experiences in the court system. After further questioning of the juror, the prosecutor did not change his position but indicated what he found troubling, namely, not only the juror's failure to reveal her own and her son's experiences in the court system but also her express indication to the contrary on the jury questionnaire. The prosecutor provided this same reason when he later challenged the juror. While the judge acted within his discretion in not permitting the juror's removal for cause, based on his dialogue with and assessment of the juror, the inquiry concerning whether the prosecutor permissibly challenged the juror is an altogether different matter. The prosecutor's concern regarding, essentially, the ability of the juror to follow simple instructions, in the context of a trial alleging murder in the first degree and involving two defendants, was sufficiently adequate.

That the prosecutor's explanation was also genuine can be

---

[19]As has been set forth, the judge merely stated, "[E]ven if I did make the foundational requirement, based on the explanation that's just been given by the Commonwealth, I'm not inclined to revisit the issue of the peremptory challenge of [the juror]."

discerned from the circumstances. It was brought out by the judge that the juror did not make her mistake on account of any difficulty with comprehending the English language set forth on the questionnaire; rather, it appeared that something in a video-tape presentation shown to her triggered a realization of some sort as indicated by her statement that she "was like, oh man." Further, Rodriguez's trial counsel was concerned only with the fact that the juror was Hispanic. He did not so much as suggest (nor did the judge make any oral note on the matter) that the prosecutor's explanation was not genuine or was suspect for any other reason, such as by some form of nonverbal communication made by the prosecutor. See *Commonwealth* v. *Maldonado, supra* ("The prosecutor's own demeanor — the furtiveness of a glance, the hesitation in giving a response, or the frantic reading of the juror questionnaire before proffering an explanation may provide valuable clues as to whether even a sound reason for the challenge is genuine or merely a post hoc justification for an impermissibly motivated challenge"). In these circumstances, we find no error in the judge's ruling excluding the juror.

ii. *Jury instructions on identification.* Rodriguez argues that a substantial likelihood of a miscarriage of justice occurred because his trial counsel did not request a jury instruction on an "honest but mistaken" identification (by Rose) as set forth in *Commonwealth* v. *Pressley*, 390 Mass. 617, 619-620 (1983). He further maintains that, based on the evidence, the judge, on his own initiative, should have given the instruction. Rodriguez points out that the only evidence implicating him as having been involved in the beating of the victim was the testimony of Rose, who had been intoxicated at the time and was not well acquainted with him and, consequently, could have been mistaken in her identification of him.

There are instances where "[f]airness to a defendant compels the trial judge to give an instruction on the possibility of an honest but mistaken identification when the facts permit it and when the defendant requests it." *Id.* at 620. Here, Rodriguez's trial counsel requested an instruction on identification, but it did not include the words "honest but mistaken." "In the absence of a request, a judge is not required to instruct the jury on 'honest mistake.' " *Commonwealth* v. *Vardinski*, 438 Mass. 444, 457

(2003), citing *Commonwealth* v. *Pressley, supra.* Thus, there was no error by the judge.

The identification instruction given by the judge essentially was the one requested by Rodriguez's trial counsel and the one approved as a model in *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 310-311 (1979) (Appendix).[20] The instruction included the directive to the jury to "[c]onsider whether [the identifying witness] . . . had the capacity and opportunity to make a reliable observation on the matter covered in his or her testimony." See *Commonwealth* v. *Cuffie,* 414 Mass. 632, 640-641 (1993) (Appendix). This particular language was adequate to avoid basing the identification analysis solely on the veracity of the identifying witness.[21] See *Commonwealth* v. *Delong,* 72 Mass. App. Ct. 42, 49 (2008). While the better practice is to include in the *Rodriguez* instruction the "honest but mistaken" language set forth in the *Pressley* case, see *Commonwealth* v. *Pires,* 453 Mass. 66, 71-72 (2009), we conclude that, because the charge as a whole adequately covered the issue, no substantial likelihood of a miscarriage of justice arose from Rodriguez's trial counsel's failure to request the "honest but mistaken" language. See *Commonwealth* v. *Cruz,* 445 Mass. 589, 596-597 (2005).

iii. *Autopsy photographs and testimony of medical examiner.* Rodriguez argues that the admission of several autopsy photographs, as well as certain testimony of the medical examiner, was erroneous and created a substantial likelihood of a miscarriage of justice. As has been noted, see note 13, *supra,* the medical examiner who conducted the victim's autopsy, Dr. Leonard Atkins, was unavailable to testify at trial. In his absence, Dr. Richard John Evans testified. Rodriguez's trial counsel objected to the admission of the autopsy photographs of the victim (there were seven photographs which depicted the victim's external injuries only), arguing that they were inadmissible because they were inflammatory and insufficiently authenticated as Dr. Evans did not personally conduct or observe the victim's autopsy. The

[20]The instruction properly excluded language permitting the jury to take into account "the strength of the identification" in determining its accuracy. See *Commonwealth* v. *Santoli,* 424 Mass. 837, 845 (1997), quoting *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 311 (1979) (Appendix).

[21]We reject Rodriguez's interpretation of this language as bearing only on the issue of determining the veracity of the witness.

judge overruled the objection.[22] Dr. Evans proceeded to testify at length about the injuries depicted in the photographs and, as to some of those injuries, his opinion on the cause of the injury. Dr. Evans also testified, with no objection from the defendants, about the findings and conclusions made by Dr. Atkins concerning the external and internal injuries to the victim that Dr. Atkins recorded in his autopsy report. Dr. Atkins's chart, showing the external injuries to the victim, was admitted in evidence.[23] Rodriguez contends that his trial counsel should have objected, on hearsay grounds, to the admission of Dr. Evans's testimony concerning the findings and conclusions of Dr. Atkins and to the admission of the chart prepared by him.

The Commonwealth concedes that the autopsy photographs were admitted "without proper foundation." "Photographs usually are authenticated directly through competent testimony that the scene they show is a fair and accurate representation of something the witness actually saw." *Commonwealth* v. *Figueroa*, 56 Mass. App. Ct. 641, 646 (2002), and cases cited. Alternatively, authenticity may be established circumstantially. *Id.* See *Commonwealth* v. *LaCorte*, 373 Mass. 700, 704 (1977), quoting W.B. Leach & P.J. Liacos, Massachusetts Evidence 265 (4th ed. 1967) ("[A] thing offered in evidence genuinely must be what its proponent represents it to be. Its authenticity must be stipulated or else proved like any other fact. 'Such proof of authenticity usually takes the form of testimony of a qualified witness either [1] that the thing is what its proponent represents it to be, or [2] that circumstances exist which imply that the thing is what its proponent represents it to be' "); Mass. G. Evid. § 901 (2010). Here, neither foundational requirement was satisfied.

The Commonwealth contends that Rodriguez was not preju-

---

[22]The judge instructed the jury that they were not to be influenced by the graphic or gruesome nature of the photographs, but rather were to limit their use of the photographs to discerning the nature of the victim's injuries. There is no argument on appeal that the photographs were inflammatory.

[23]The chart consists of two pages. One page has what appears to be a preprinted diagram of a male body, showing both a view of the front and the back of the body. On this page, there are handwritten notes made by Dr. Atkins indicating where external injuries to the victim appeared on his body. Some of the notes also state the exact measurement of the injury. On the second page, a similar diagram and notations exist, but they are done in connection with four different views of a head (front, back, left side, and right side).

diced by the admission of the photographs because there was no dispute as to the victim's cause of death, there was no dispute that the victim was found severely injured on Bluefield Street, the photographs were cumulative of the description of the victim's attack "given by several witnesses," and the photographs had no bearing on Rodriguez's defense of misidentification. An error is "nonprejudicial only if the Commonwealth can convince us 'with fair assurance' that that failure did not 'substantially sway[]' the outcome of the case." *Commonwealth* v. *Rosado*, 428 Mass. 76, 80 (1998), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

The autopsy photographs were not cumulative of other evidence. To the extent that Dr. Evans testified about what the photographs depicted, he could not have done so without the photographs themselves because he had not been present at the victim's autopsy. While the external injuries depicted in the photographs were also noted in Dr. Atkins's chart, the admission of Dr. Atkins's chart, as will be discussed, was erroneous. See *Commonwealth* v. *Nardi*, 452 Mass. 379, 392-393 (2008). A paramedic's testimony concerning the nature of the victim's external injuries spoke only to his observations of various "bruises" on different parts of the victim's body. The photographs, in contrast, depict more than bruises, particularly with regard to the victim's face, such as measurable swelling and patterns such as parallel lines on the forehead area (made possibly by footwear tread, as opined by Dr. Evans). Indeed, the judge acknowledged that the photographs were "gruesome," a characterization with which we agree based on our own examination of them. This is a case where the testimony concerning the victim's external injuries does not accurately and fully describe what the photographs disturbingly and graphically depict. The severity of the assault on the victim cannot be fully comprehended until the photographs are viewed, and we cannot say that the photographs did not have an impact on the jury.

Although the photographs did not bear on Rodriguez's defense of misidentification, they were significant to the Commonwealth in establishing its burden of proof. Because the jury rejected the theory that the victim's death was deliberately premeditated, the Commonwealth had to prove that the victim's death was committed with extreme atrocity or cruelty. The facts that the victim

was severely beaten or that his death was a result of acute mas-
sive intra-abdominal hemorrhage due to blunt force trauma,
although factors to consider, did not compel a finding that the
murder was committed with extreme atrocity or cruelty. Apart
from the photographs there were witness accounts that the victim
was being assaulted repeatedly by a group of men, but the
severity of that assault was not reflected by the testimony of
those witnesses. Two of the three witnesses who provided testi-
mony on the matter, Amaral and Kevin Rose, fled as soon as
they could and could not provide a full or detailed account. The
other witness, Rose, told police that the victim was kicked only
twelve times, and at trial could not tell how many times the
victim was kicked. Rather, the severity of the assault, as bearing
on whether the murder was committed with extreme atrocity or
cruelty, comes to light only from the photographs and the medi-
cal evidence.[24]

The question of prejudice, as to the erroneous admission of
the photographs, is a close one. We need not resolve the issue,
however, because there is no doubt that the improper admission
of the photographs, together with the improper admission of
testimony and evidence during the examination of Dr. Evans, as
argued by Rodriguez, created a substantial likelihood of a miscar-
riage of justice.

As an initial matter, there is no merit to Rodriguez's argu-
ment that Dr. Evans's testimony concerning the victim's cause
of death was inadmissible. Before he gave his opinion, Dr.
Evans stated that he had reviewed Dr. Atkins's autopsy report,
including a toxicology report, a chart depicting the victim's external
injuries, and autopsy photographs. Dr. Evans also reviewed a
case investigation sheet, medical records that were made avail-
able to Dr. Atkins, identification forms, and police reports. Dr.
Evans's testimony concerning the victim's cause of death was
based on his review of the aforesaid materials and reflected his
own opinion. His testimony was permissible, as we have held
that a "substitute medical examiner could offer an opinion as to

---

[24]That the Commonwealth understood the significance of the photographs
is reflected in the prosecutor's statements to the judge when he argued that
they be admitted: "These photographs clearly depict the nature of the injuries,
and the nature of the injuries goes right to the issue of whether or not they
were inflicted with extreme atrocity [or] cruelty."

the victim's cause of death even though that opinion was based on the facts and findings in the autopsy report that was not itself admissible." *Commonwealth* v. *Avila*, 454 Mass. 744, 760 (2009). See *Commonwealth* v. *Taylor*, 455 Mass. 372, 377 (2009); *Commonwealth* v. *Nardi, supra* at 390-391.[25]

The same cannot be said of other parts of Dr. Evans's testimony. The Commonwealth concedes that, during his direct examination, Dr. Evans should not have been permitted to testify as to the factual findings of Dr. Atkins's autopsy report pertaining to the external and internal injuries to the victim. We have cautioned that "the substitute medical examiner, as an expert witness, is not permitted on direct examination to recite or otherwise testify about the underlying factual findings of the unavailable medical examiner as contained in the autopsy report." *Commonwealth* v. *Avila, supra* at 762. See *Commonwealth* v. *Taylor, supra*; *Commonwealth* v. *Nardi, supra* at 394. In addition, Dr. Atkins's chart depicting the victim's external injuries was erroneously admitted. See *Commonwealth* v. *Pena*, 455 Mass. 1, 13 & n.13 (2009). Because Rodriguez did not object to this testimony of Dr. Evans, or to the admission of Dr. Atkins's chart, we review to determine whether the erroneous admission of this evidence created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). We must look to the trial as a whole. *Commonwealth* v. *Nardi, supra* at 395.

The Commonwealth asserts that no substantial likelihood of a miscarriage of justice occurred because Rodriguez's defense was misidentification, and because Rodriguez did not contest the victim's manner or cause of death, or that the death had been inflicted with extreme atrocity or cruelty. The improperly admitted medical evidence, like the autopsy photographs, however, took on great significance in establishing that the murder was committed with extreme atrocity or cruelty, on which the Commonwealth bore the burden of proof. We are not substantially confident that, in the absence of the improperly admitted medical evidence and autopsy photographs, the jury verdict would have

---

[25]The trial in this case occurred in 2006. This is Rodriguez's direct appeal. He receives the benefit of our decision in *Commonwealth* v. *Nardi*, 452 Mass. 379 (2008), and related precedents because his case was awaiting appellate review when those cases were decided. See *Commonwealth* v. *Mercado*, 456 Mass. 198, 211 n.24 (2010).

been the same. *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998).

As with our analysis concerning the improper admission of the autopsy photographs, the improperly admitted medical evidence was not cumulative of other admissible evidence. Cf. *Commonwealth* v. *Avila, supra* at 763 (unpreserved error under *Nardi* did not result in substantial likelihood of miscarriage of justice because erroneously admitted testimony was "distinctly cumulative"); *Commonwealth* v. *Francis*, 450 Mass. 132, 140 (2007). Dr. Evan's factual testimony about the victim's external injuries came from his examination of the inadmissible autopsy photographs and from Dr. Atkins's chart. As has been explained, the photographs were more detailed and graphic than the testimony that otherwise came in concerning the external injuries to the victim. In addition, Dr. Evans's testimony about the victim's injuries, as gleaned from Dr. Atkins's chart, was not entirely cumulative of his factual testimony describing the victim's injuries based on the autopsy photographs.[26]

Dr. Evans's testimony concerning the findings of Dr. Atkins's internal examination of the victim also was not cumulative of any other evidence at trial. Further, the details about Dr. Atkins's internal examination findings, such as the fact that the internal abnormalities to the victim were largely confined to his abdominal area, and with respect to the types and number of blows to the victim, pertained not only to the cause of the victim's death but also to whether the victim's death resulted from injuries inflicted with extreme atrocity or cruelty. The prosecutor argued as much during his closing argument. Unlike other cases, this case involves only extreme atrocity or cruelty and cannot be upheld on an alternate theory of murder, such as deliberate premeditation. See, e.g., *Commonwealth* v. *Hensley*, 454 Mass. 721, 733-734 (2009).

Further, Marshall emphasized the details of Dr. Atkins's internal examination findings to support his defense that he only kicked the victim in the knee and the abrasions to the knee did not contribute to the victim's death. The autopsy findings of Dr. Atkins became important to Marshall because there was

---

[26]For instance, there was no autopsy photograph depicting abrasions to both of the victim's cheeks (only one cheek was shown), or the laceration to the victim's lower lip, as was noted on Dr. Atkins's chart and described by Dr. Evans during his direct examination.

forensic evidence linking Marshall to the crime, namely DNA evidence of the victim's blood on Marshall's boot. There was no forensic evidence, however, against Rodriguez, and he did not use details from Dr. Evans's testimony or the autopsy report in his defense. Cf. *Commonwealth* v. *Pena, supra* at 15 (hearsay error under *Nardi* case not harmless beyond reasonable doubt in part because erroneously admitted findings were affirmatively used by defense); *Commonwealth* v. *Nardi, supra* at 395 (no substantial likelihood of miscarriage of justice where inadmissible evidence was important to defense). As has been noted, the case against Rodriguez was not overwhelming. The only evidence implicating him came from Rose. Cf. *Commonwealth* v. *Mercado*, 456 Mass. 198, 211 (2010) (hearsay violation under *Nardi* case did not create substantial likelihood of miscarriage of justice in part because defendant confessed to shooting). Her testimony, as has been described, did not establish the severity of the attack in the same manner and with the same effect as did the autopsy photographs and medical evidence.

In this case, we conclude that the erroneous admission of the autopsy photographs, chart, and testimony of Dr. Evans concerning the factual findings made by Dr. Atkins, considered together, created a substantial likelihood of a miscarriage of justice. We cannot say with substantial confidence that, in the absence of the improperly admitted evidence, the jury verdict on the issue whether the murder was committed with extreme atrocity or cruelty would have been the same. See *Commonwealth* v. *Ruddock, supra.*

The evidentiary errors, however, pertain only to Rodriguez's conviction based on murder in the first degree under the theory of extreme atrocity or cruelty, and involve only the question whether the murder was committed with extreme atrocity or cruelty. We have reviewed the record and have found that there was sufficient evidence that Rodriguez committed (individually or as a joint venturer) an unlawful killing, and that he intended, at least, to cause grievous bodily harm, the so-called second prong of malice, and the jury verdict established that Rodriguez was guilty of murder. In these circumstances, all the necessary elements of murder in the second degree have been proved beyond a reasonable doubt. See *Commonwealth* v. *Gilbert*, 447 Mass. 161, 171-172 (2006). "If a conviction of murder in the first degree cannot stand because of error or because of the

requirements of justice (G. L. c. 278, § 33E), but the jury's determination that the defendant was guilty of murder is not infected with error, we have the option of directing a reduction in the verdict to murder in the second degree rather than ordering a new trial." *Commonwealth* v. *Lennon*, 399 Mass. 443, 449 (1987), and cases cited. See *Commonwealth* v. *Burton*, 450 Mass. 55, 60 (2007); *Commonwealth* v. *Gilbert, supra* at 176.[27] In the interests of justice we vacate the verdict of murder in the first degree and direct the entry of a verdict of murder in the second degree pursuant to our power under G. L. c. 278, § 33E.

iv. *Relief pursuant to G. L. c. 278, § 33E.* Although Rodriguez does not raise a claim seeking relief pursuant to G. L. c. 278, § 33E, we are obligated nonetheless to review the entire record. Having done so, we see no reason under G. L. c. 278, § 33E, to order a new trial or to reduce the verdict further.

b. *Marshall's appeal.* The indictment charging Marshall as an accessory before the fact was framed under G. L. c. 274, § 2,[28] and in conformity with G. L. c. 277, § 79.[29],[30] After the close

----

[27]During oral argument the prosecutor was asked whether there was any preference between a reduction in the verdict to murder in the second degree or the ordering of a new trial. We have not received any indication of a preference.

[28]General Laws c. 274, § 2, as appearing in St. 1973, c. 529, § 1, reads:

> "Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon."

[29]General Laws c. 277, § 79, which prescribes the form of an indictment, provides as follows:

> "*Accessory before the fact.* (Under Chap. 274, Sec. 2) — *Charge principal felony and proceed*: That A.B., before the said felony was committed, did incite, procure, aid, counsel, hire or command the said (principal) the said felony to do and commit."

[30]The indictment against Marshall reads, in pertinent part:

> "THE JURORS for the said Commonwealth on their oath present, That Robert Tirado and Orlando Badillo and Dennis Smith and Lionel Rodriguez, on or about February 16, 2001, at New Bedford, in the County of Bristol aforesaid, did assault and beat George R. Carpenter with intent to murder him, and by such assault and beating did kill and murder the said George R. Carpenter.

> "That Ryan Marshall, before the said felony was committed, did

of the Commonwealth's evidence, Marshall's trial counsel moved for a required finding of not guilty, arguing that there was no evidence that, before the beating of the victim, Marshall had counselled, hired, or otherwise procured the others to commit the assault on the victim. He also argued that there was insufficient proof that Marshall shared the intent required of the principal. The prosecutor conceded that there was no evidence, pursuant to G. L. c. 274, § 2, that Marshall counselled, hired, or otherwise procured the felony. Instead, the prosecutor argued that there was sufficient evidence from which the jury could find that Marshall "aid[ed]" Tirado, Badillo, Smith, and Rodriguez in committing the felony under G. L. c. 274, § 2, and shared their intent. The judge agreed, stating that the crime of being an accessory before the fact "is largely identical to the joint venture doctrine," and that pursuant to *Commonwealth* v. *Raposo*, 413 Mass. 182, 185 (1992), the Commonwealth was required to show that, in addition to knowledge of the crime and a shared intent to bring it about, Marshall had engaged in "some sort of act that contributes to its happening." The judge denied Marshall's motion. Marshall claims error in the denial of his motion, asserting that there was insufficient evidence to convict him of being an accessory before the fact because there was no evidence that he did anything before the murder was committed.

By moving for a required finding of not guilty, Marshall preserved his claim of error. The well-established principles governing a motion for a required finding are set forth in *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), and are not in dispute. The issues we confront are legal, namely, whether, under G. L. c. 274, § 2, the criminal actions of an accessory before the fact encompass the actions of an "aider," and whether the evidence of being an accessory before the fact was sufficient to satisfy the *Latimore* standard.

As was recently noted in *Commonwealth* v. *Zanetti*, 454 Mass. 449, 463 (2009), there has been confusion over the years with respect to the different formulations of accomplice liability. There is no question that under G. L. c. 274, § 2, an accessory

incite, procure, aid, counsel, hire or command the said Robert Tirado and Orlando Badillo and Dennis Smith and Lionel Rodriguez, the said felony to do and commit."

before the fact is one who counsels, hires, or otherwise procures the commission of a felony. The statute, however, also speaks to the actions of "[w]hoever aids in the commission of a felony." *Id.* Contrary to what appears to be the Commonwealth's contention, the actions of one who "aids" and "accessories before the fact" are not the same, and are separate and distinct forms of accomplice liability.

In construing G. L. c. 274, § 2, we are guided by the familiar standards of statutory interpretation. "Where the language of a statute is plain, it must be interpreted in accordance with the usual and natural meaning of the words." *Gurley* v. *Commonwealth*, 363 Mass. 595, 598 (1973). Absent clear indication to the contrary, statutory language is to be given its "ordinary lexical meaning." *Surrey* v. *Lumbermens Mut. Cas. Co.*, 384 Mass. 171, 176 (1981). Here, the plain meaning of "aid[]" is to provide actual assistance. See Webster's Third New Int'l Dictionary 44 (1995). The term, in context, must be understood to require some degree of knowing participation (alone or with others) in the commission of the underlying felony. See *Commonwealth* v. *DiStasio*, 297 Mass. 347, 360-361, cert. denied, 302 U.S. 683 and 302 U.S. 759 (1937) (evidence of participation in murder required on charge of murder, but not on charge of accessory before the fact). See also *Commonwealth* v. *Zanetti*, *supra* at 466-468. In contrast, one who engages in "counselling, hiring or otherwise procuring" a felony to be committed need not participate in committing the felony, although that person may be present during the felony and must have participated in an act, as opposed to mere acquiescence, that led up to or in some way contributed to the occurrence of the felony. See *Commonwealth* v. *DiStasio*, *supra*. See also *Commonwealth* v. *Morrow*, 363 Mass. 601, 608-609 (1973). The difference is that the actions punishable by an accessory before the fact are limited by the express language of G. L. c. 274, § 2, to actions that occurred "before the fact," that is, prior to the commission of the felony. To construe the statute otherwise would render the words "before the fact" superfluous. *Banushi* v. *Dorfman*, 438 Mass. 242, 245 (2002) ("We do not read a statute so as to render any of its terms meaningless or superfluous").

That the actions of an aider and an accessory before the fact involve *different acts* and *different crimes* is further understood

by the grammar of the text of G. L. c. 274, § 2, and the title of the act under which it was enacted. The title of St. 1973, c. 529, reads: "An Act relative to the indictment, trial and punishment of persons who aid in the commission of a felony or counsel, hire or otherwise procure a felony to be committed." The use of the conjunction "or" separating those persons who "aid" from those who "counsel, hire or otherwise procure" indicates separate classifications of criminal actors. See *Eastern Mass. Street Ry.* v. *Massachusetts Bay Transp. Auth.*, 350 Mass. 340, 343 (1966) ("The word 'or' is given a disjunctive meaning unless the context and main purpose of all the words demand otherwise"). See also *Silverman* v. *Wedge*, 339 Mass. 244, 245 (1959) (title of act is to be considered when construing act). Indeed, there would be no need to refer to distinct categories of actors separately if they were one and the same. Our interpretation is bolstered by the Legislature's use of the conjunction "or" in the text of § 2, which again suggests that the actors and acts designated before and after that conjunction are indeed distinct. See *Eastern Mass. Street Ry.* v. *Massachusetts Bay Transp. Auth.*, *supra.* Based on our construction of the statute, we conclude that it punishes two separate and distinct offenses, namely, aiding (colloquially known as aiding and abetting) and guilt as an accessory before the fact.

We are mindful that our case law has conflated these two forms of accomplice liability in the past. Confusion arose, in part, in connection with the genesis of G. L. c. 274, § 2. Because of common-law classifications that defined parties to a felony in terms of principals in the first or second degree and accessories before and after the fact, and resulting procedural difficulties, legislative action became necessary, and §§ 2 and 3[31] of G. L. c. 274 were enacted. See *Commonwealth* v. *Ortiz*, 424 Mass. 853, 856-857 (1997). See also *Commonwealth* v. *Zanetti*, *supra* at 461-462, 467. Prior to amendment in 1968, and in the current version of G. L. c. 274, § 2, which has been in effect since 1973, the statute provides that whoever "aids" and every "accessory

---

[31]General Laws c. 274, § 3, addresses a series of procedural issues that arise in connection with the prosecution of one who "counsels, hires or otherwise procures a felony to be committed." See *Commonwealth* v. *Ortiz*, 424 Mass. 853, 857 & n.5 (1997). The statute also expressly permits one who "counsels, hires or otherwise procures a felony to be committed" to be indicted as an accessory before the fact or to be indicted on "the substantive felony." G. L. c. 274, § 3.

thereto before the fact" is to be *punished* in the same manner as the principal felon. See St. 1973, c. 529, § 1; R.L. (1902), c. 215, § 2. The effect of this language was to abrogate the distinction between principals and accessories insofar as punishment is concerned. See *Commonwealth* v. *Ortiz, supra* at 857. In 1968, the Legislature amended the statute. The only change the amendment made to § 2 of the statute concerned the prosecution of the crimes therein enumerated, striking the language concerning punishment and inserting in its place that aiders and accessories before the fact "shall be indicted, tried and punished as a principal." St. 1968, c. 206, § 1. This substitution of language effectively eliminated any indictment or trial for accessories before the fact. This change, however, only remained in place until 1973, when the Legislature restored the punishment language above discussed. Thus, although there no longer was to be a distinction *in punishment* for aiders and abettors and accessories before the fact, the distinction between the two types of accomplice liability has, since at least 1902, remained a constant.

To complicate further the subject matter of accomplice liability, the joint venture formulation, as discussed in *Commonwealth* v. *Zanetti, supra* at 461-464, derived from the language of G. L. c. 274, § 2. Based on the recent evolution of our case law on joint venture, "renounc[ing] the false distinction between a principal and an accomplice," *Commonwealth* v. *Zanetti, supra* at 464, there is no longer a need to determine whether a defendant is a joint venturer as defined in *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983), and we have instead adopted an aiding and abetting analysis and formulation, *Commonwealth* v. *Zanetti, supra* at 467. That said, although this change applied prospectively, it underscores the fact that, for culpability under aiding and abetting, there must be some level of actual participation of a defendant (alone or with others) in the commission of a crime, an element not required for that portion of G. L. c. 274, § 2, applicable to accessories before the fact whose conduct involves actions done at a different time, namely, before the commission of the felony.

Under our construction of G. L. c. 274, § 2, the indictment charging Marshall improperly defined the offense on which he was tried — accessory before the fact. While this may have

been excusable on account of adherence to the statutory form of an indictment charging accessory before the fact,[32] the judge submitted the case to the jury with improper instructions, as he told the jury that they could convict Marshall as an accessory before the fact if he "aided in the commission of the murder of [the victim]." This instruction was erroneous, because, even under the indictment with the improper definition, the indictment charged conduct that took place "before the said felony was committed," an element that we have stated is required under G. L. c. 274, § 2, to establish guilt as an accessory before the fact. In this case, the evidence was insufficient to satisfy this requirement, for there was no evidence at trial that Marshall, before the felony took place (as was required by the indictment, the statutory prescribed indictment form, and G. L. c. 274, § 2), counselled, hired, or otherwise procured the felony to be committed. Rather, the evidence established his active participation in, and presence during, the commission of the felony. To charge Marshall with this conduct, the Commonwealth should have simply added Marshall's name to that portion of the indictment alleging murder, without reference to Marshall's acting as an accessory before the fact. Thereafter, the Commonwealth could have proceeded at trial under a joint venture theory, as it did with Rodriguez. The form of the indictment as to Marshall, while technically compliant with G. L. c. 277, § 79, was not sufficient to charge Marshall with his actual participation in the victim's murder, which is what the prosecution sought to do (and which is how the case went to the jury). This latter observation aside, because the evidence presented was legally insufficient to warrant a finding of Marshall's guilt as an accessory before the fact, Marshall's motion for a required finding of not guilty should have been allowed. Consequently, the verdict finding him guilty must be set aside.[33,34]

---

[32]In future indictments charging guilt as an accessory before the fact, such indictments should set forth that "A.B., before the said felony was committed, did counsel, hire or otherwise procure the said (principal) the said felony to do and commit."

[33]Conduct underlying a charge of accessory before the fact may be charged as aiding and abetting, as formulated in our suggested jury instruction set forth in *Commonwealth* v. *Zanetti*, 454 Mass. 449, 470 (2009) (Appendix), for the offense of aiding and abetting is broader than the offense of being an accessory before the fact. In such cases, there would be no need to charge a

3. *Conclusion.* As to Rodriguez, we vacate the verdict of murder in the first degree. We remand the case to the Superior Court for the entry of a verdict of guilty of murder in the second degree, and for the imposition of a sentence of "imprisonment in the [S]tate prison for life." G. L. c. 265, § 2. With respect to Marshall, his conviction is reversed, and the verdict is set aside.

*So ordered.*

MARSHALL, C.J. (concurring, with whom Spina, J., joins). I agree with the result reached by the court in these cases. I write separately to express again my concern about the continued use of peremptory challenges. See *Commonwealth* v. *Maldonado,* 439 Mass. 460, 468 (2003) (Marshall, C.J., concurring). I remain persuaded that, "rather than impose on trial judges the impossible task of scrutinizing peremptory challenges for improper motives," *Commonwealth* v. *Calderon,* 431 Mass. 21, 29 (2000) (Lynch, J., dissenting), it is time either to abolish them entirely, or to restrict their use substantially.

---

defendant as an accessory before the fact; rather, a charge of murder would be the appropriate charge.

[34]We need not address Marshall's remaining arguments because he cannot be retried as an accessory before the fact.