COMMONWEALTH vs. ROGER C. HERBERT.

Suffolk. October 5, 1995. - November 9, 1995.

Present: LIACOS, C.J., WILKINS, LYNCH, GREANEY, & FRIED, JJ.

*Constitutional Law*, Admissions and confessions, Jury. *Jury and Jurors. Practice, Criminal*, Challenge to jurors, Instructions to jury, Capital case. *Intoxication. Homicide.*

At the trial of an indictment for first degree murder the judge correctly concluded that the Commonwealth had proved beyond a reasonable doubt that the defendant had received and understood his Miranda rights and that the defendant's statements to the police were voluntary, where there was adequate evidentiary support for the judge's subsidiary findings of fact: the defendant's motion to suppress his statements was correctly denied. [309-313]

At a murder trial, the judge properly acted within his discretion in allowing the prosecutor's peremptory challenge of a certain juror, where the record showed that the prosecutor advanced a race-neutral basis for the challenge that supported the judge's ruling. [313-315]

At a murder trial the judge correctly declined to instruct the jury on the effect of intoxication on the defendant's ability to form the intent that must be proved as a necessary element of the crime, where there was no evidence to raise the issue of intoxication. [315-316]

There was no reason for this court to exercise its power under G. L. c. 278, § 33E, to reduce a murder conviction to murder in the second degree. [316]

INDICTMENTS found and returned in the Superior Court Department on January 31, 1990.

The cases were tried before *Robert A. Mulligan*, J.

*Jonathan Shapiro* for the defendant.

*John P. Zanini*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court found the defendant, Roger C. Herbert, guilty of armed robbery and murder in the first degree by reason of felony-murder (the

armed robbery) and extreme atrocity or cruelty. The defendant was sentenced to the mandatory term of life imprisonment on the murder conviction, and to a concurrent term of imprisonment on the armed robbery conviction. On appeal, the defendant contends that the trial judge erred by (1) denying his motion to suppress his statements to investigating police officers and incriminating evidence that was discovered as a result of the statements; (2) failing to find as pretext the prosecutor's reasons for using a peremptory challenge to dismiss a black female juror; and (3) failing to give an instruction on the effect of intoxication on the specific intent elements of the crimes. We reject these contentions, and also we conclude that there is no basis for granting the defendant relief pursuant to G. L. c. 278, § 33E (1994 ed.). Accordingly, we affirm the defendant's convictions.

There was evidence in the Commonwealth's case from which the jury could find the following. On January 14, 1990, after watching the 9:50 P.M. movie at Cinema 57 in Boston, the defendant, a nineteen year old black man, and a group of young men and women were walking toward Columbus Avenue when some of the young men (but not the defendant) suggested that the group "beat someone down." The defendant was armed with a combat-type knife which had a twelve-inch blade, sharp on one edge, serrated on the other. At least two other young men in the defendant's group were also carrying knives. The group observed the victim, a nineteen year old student at Northeastern University, while he was walking on Columbus Avenue toward the Ruggles Street MBTA station. The defendant and his companions chased and trapped the victim, who screamed for help. When the victim offered resistance, the defendant and his companions started beating him. As the assault continued, the defendant was seen stabbing the victim repeatedly. The medical examiner found five stab wounds of varying depth and severity on the victim's body and noted that the fatal wound had severed the victim's aorta. The victim's face exhibited injuries consistent with a severe beating. His wallet had been taken. The prosecution presented its case against the defend-

ant through witnesses who had been with the defendant and his group on the night of the killing and through other witnesses who knew the victim or had been in the area on the night of the victim's death. Some witnesses had seen the defendant's camouflage combat-type knife; one witness had seen the beginning of the pursuit; two witnesses had seen the beating and stabbing of the victim; and other witnesses had heard the defendant make incriminating statements after the crimes. The jury also had before them the defendant's tape-recorded statement in which he admitted to committing the crimes and described how he had disposed of the knife. Based on the information furnished by the defendant, the knife was found by the police and introduced in evidence. The defendant presented no evidence on his own behalf, arguing instead, through his counsel, that the stabbing of the victim had been an impulsive act motivated by anger.

1. The defendant filed a pretrial motion challenging the voluntariness of his statements to the police. The motion was accompanied by an affidavit of his counsel, which alleged that the defendant lacked the mental capacity to make intelligent and voluntary statements, and his own affidavit in which the defendant alleged that he had not been advised of his Miranda rights before he made incriminating statements, and had requested, and been denied, the opportunity to consult with an attorney. The trial judge held an evidentiary hearing after which he made written findings of fact and conclusions of law. The trial judge's findings of fact are as follows:

> "1. At 7:30 a.m. on January 21, 1990, the defendant was informed that he was being arrested for the stabbing murder of [a] Northeastern University student . . . .

> "2. Detective Brendan Bradley orally informed Roger Herbert of his *Miranda* rights in the kitchen of Herbert's house at 62 Hammond Street, Roxbury.

"3. Roger Herbert was transported to the homicide division of the Boston Police Department in South Boston. During his booking by Detective Bruce Holloway, the defendant was advised of his *Miranda* rights. As he read the defendant each right from his *Miranda* card, Holloway asked Herbert whether he understood that right. The defendant responded that he did understand as to each right.

"4. The defendant made an oral statement to Detectives Holloway and Washington about his involvement in the killing and robbery of [the victim].

"5. Detective Holloway asked the defendant if he were willing to give a tape recorded statement. The defendant said that he would. Detective Holloway presented the defendant with a written *Miranda* form and told Herbert that it contained his *Miranda* rights in written form, the same rights that he had been given previously. The defendant looked over the form and signed it. The detectives signed as witnesses.

"6. The tape recorder was set up and the defendant was advised of his *Miranda* rights on tape. The defendant stated that he understood his rights. The defendant then gave his tape recorded statement, essentially the same, but somewhat more detailed than his previous unrecorded statement.

"7. The defendant was well cognizant of his *Miranda* rights prior to receiving any warnings on January 21, 1990.

"8. No police officer told the defendant that he should tell the truth, and the defendant never requested an attorney, and he was never told that an attorney was not available.

"9. The defendant made the statement, voluntarily motivated by his perceived self-interest. He was not under the influence of drugs or alcohol and he was not cajoled, tricked or persuaded to make his statements."

Based on these findings, the trial judge concluded that the Commonwealth had proved beyond a reasonable doubt that the defendant had received and understood his Miranda rights and had chosen to make statements to the police. The judge further concluded that the defendant's statements, including the tape-recorded statement, were voluntary beyond a reasonable doubt because the statements were the product of the defendant's free will and rational intellect.

The defendant testified at the hearing on the motion to suppress. He stated that, prior to his interview with Detectives Holloway and Washington at the police station, he was held for a time after booking in a room with two uniformed police officers. The defendant testified that, during that time, one of the officers encouraged him to tell the truth and not to "go down alone." According to the defendant, he asked one of the uniformed officers if he could see his lawyer and was told that no lawyer was available. In addition, the defendant testified that when Detective Holloway arrived, the defendant reiterated his request to see a lawyer, and that Holloway ignored this request. The defendant also stated that the first time he was advised of his Miranda rights was immediately prior to giving his tape-recorded statement. Thus, according to the defendant, he had given a complete account of his part in the attack on the victim before he was advised of his rights.

The defendant argues that, in light of his testimony, summarized above, particularly his uncontroverted testimony about his request to the uniformed police officers for an opportunity to consult with his lawyer, the trial judge's finding no. 8 ("No police officer told the defendant that he should tell the truth and the defendant never requested an attorney, and he was never told that an attorney was not available") is clearly erroneous. In making this argument, the defendant

recognizes that the trial judge disbelieved his testimony on the point. Nonetheless, the defendant urges, disbelief of his testimony does not establish the contrary proposition, and he maintains that, in the absence of direct evidentiary support for finding no. 8, the Commonwealth cannot be said to have satisfied its burden of proving, beyond a reasonable doubt, that the defendant did not invoke his right to counsel. See *Commonwealth* v. *Hamilton*, 411 Mass. 313, 319 (1991). We disagree.

There was an adequate evidentiary basis for the judge's finding no. 8. There was testimony, accepted by the judge, that the defendant was given his Miranda warnings four times on the day of his arrest. He was informed of his rights twice before he was asked any questions (other than booking questions) and indicated he understood those rights. The defendant specifically requested that Detective Washington be present during the interrogation. Washington lived in the defendant's neighborhood and had known the defendant for four or five years before the events in question. There was no testimony that the defendant requested that Washington obtain, or make contact with, an attorney for him.

Detective Holloway directly contradicted the defendant's assertion that the defendant had asked Holloway for access to counsel. The judge credited Holloway. Holloway also testified, in response to questions posed by the defendant's counsel, that he had spoken with the uniformed officers who indicated only that while waiting for Holloway, the defendant had been upset and had made remarks about white police officers. The defendant's credibility was undermined by other evidence and testimony to which the judge referred in his findings. The defendant testified that he did not understand the Miranda warnings he admitted receiving. He also asserted that he had not been advised of his rights in connection with any of his previous nine arrests, although the booking sheets for at least some of those arrests, offered by the Commonwealth, showed the defendant's signature acknowledging that he had been informed of his rights.

Finding no. 8 derived from the testimony just summarized and inferences reasonably drawn therefrom. The trial judge's finding is based on his rejection of the defendant's testimony as contrived, and on reasonable inferences drawn from testimony by the police witnesses and Detective Holloway's testimony concerning the defendant's conversation with the uniformed officers. "The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses." *Commonwealth* v. *Harmon*, 410 Mass. 425, 431 (1991), quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). *Commonwealth* v. *Martino*, 412 Mass. 267, 274-275 (1992). The experienced trial judge undoubtedly was aware that the prosecutor's failure to call either of the uniformed officers could support an inference that their testimony would have been unfavorable to the Commonwealth, but the judge certainly was not required to draw that inference. Cf. *Commonwealth* v. *Figueroa*, 413 Mass. 193, 198-199 (1992) (discussing, with respect to "missing witness" jury instruction, reasons why inference might not be warranted). There was no error in the denial of the defendant's motion to suppress.

2. In the course of jury selection,[1] two of eight prospective black jurors in the first panel[2] were excused by the trial judge for cause. The prosecutor exercised peremptory challenges against three of the remaining six prospective jurors. Prior to the challenge of the third prospective black juror, a female, the defendant's counsel objected that the prosecutor was systematically excluding black persons from the jury. The trial judge asked the prosecutor to give his reasons for dismissing the prospective juror. The prosecutor stated that the prospective juror lived near the area where the crime had been committed, that he had considered the juror's demeanor

---

[1]Pursuant to the defendant's request, the members of the venire were questioned individually about any potential bias or prejudice they might harbor based on race in view of the fact that the defendant was a black man and the victim a white man.

[2]A sixteenth and final juror was selected from a second panel. Neither the record nor the briefs disclose the composition of the second panel.

and facial expressions, and that she had been hesitant and unsure in answering the trial judge's questions about her ability to decide the case fairly and impartially.[3] In permitting the challenge, the trial judge mentioned a fact (that the prospective juror was a "young woman") which the prosecutor had not offered in his explanation in support of the challenge.[4]

This case was tried before the decision in *Commonwealth v. Burnett*, 418 Mass. 769 (1994), was issued, and the judge did not make an explicit finding that a pattern of improper challenges had been shown. See *id.* at 771 ("When the issue of improper peremptory challenges is raised, the trial judge should make a finding as to whether the requisite prima facie showing of impropriety has been made"). Based on the judge's comment, see *supra*, note 4, and his ruling on the merits of the prosecutor's challenge, we assume that he made an implicit finding that a possible pattern of exclusion based on race had been established. See *Commonwealth v. Caldwell*, 418 Mass. 777, 778 (1994); *Commonwealth v. Carleton*, 418 Mass. 773, 774 (1994). We consider whether the judge's acceptance of the challenge to the juror was correct.

The defendant suggests that it was improper for the judge to add to the prosecutor's explanation a consideration that had not been articulated by the prosecutor. He further argues that the challenge should have been disallowed because

---

[3]When the trial judge initially asked the juror whether she could be fair and impartial, and could decide the case based solely on the evidence presented, she responded, "Maybe." When the trial judge repeated this question, the juror replied "Yeah." The trial judge asked the juror if she was "confident" that she could do that, and she responded "Somewhat — you know, not too sure, but — ". After further questions by the trial judge, the juror answered "Yes" to the question whether she could confine her deliberations to the evidence presented in court, and "No" to the question whether she had any feelings about white persons that would affect her ability to decide the case.

[4]The trial judge accepted the prosecutor's explanation with the following statement: "I'll let it go through. He's expressed a reason that she is a young woman, she was hesitant in answering the questions. I'll let this go through, but you're going to have a real problem with the next one, Mr. [prosecutor]."

other prospective jurors who lived in the area of the crime had not been challenged, and still other prospective jurors who had hesitated in some of their responses had been accepted. We conclude that the trial judge acted within his discretion in allowing the challenge. The judge's statement that the prospective juror was a young woman was, considered in context, an observation linked to her demeanor and her failure to give assured responses to key questions which sought to determine her ability to decide the case on the evidence.[5] "A juror's demeanor and reactions during the voir dire may constitute a sufficient basis for peremptory removal." *Commonwealth v. Caldwell, supra.* A trial judge is in a better position than is an appellate court to assess the validity of a challenge to a juror based on demeanor and hesitancy in responding to crucial questions. *Id.* The prosecutor and the judge evaluated the prospective juror's answers, and her diffidence, as these factors related to the responses expressed by other prospective jurors. The record shows to our satisfaction that the prosecutor advanced a race-neutral basis for the challenge, and the record supports the trial judge's allowance of the challenge.

3. The defendant's written requests for jury instructions contained no request for an instruction on the effect of intoxication on the defendant's ability to form the intent that must be proved as a necessary element of the crimes charged. During a charge conference, the defendant's counsel orally requested such an instruction. The trial judge denied the request, stating "[t]here's insufficient evidence to raise the issue of intoxication relative to specific intent in this case." The defendant now argues that the evidence required an instruction on the issue.

---

[5]We have examined carefully the colloquies with seven other potential jurors who, the defendant asserts, gave responses as equivocal as those of the challenged juror but who were not challenged by the Commonwealth. One of these potential jurors was, in fact, challenged by the Commonwealth. Of the remaining six jurors, none expressed doubt about his or her ability to be fair, as did the challenged juror, although they tended to couch their responses in less than absolute terms.

The trial judge's ruling was correct. The evidence on the subject of intoxication indicated that the defendant had consumed "a couple of beers" several hours before the victim's killing. No testimony or other evidence suggested that the defendant appeared impaired to any degree by the consumption of alcohol. Nothing in the evidence raised a reasonable doubt whether the defendant was so intoxicated at the time of the incident that he was incapable of forming the intent that is a necessary element of the crimes charged. The defendant never directly made any such claim, but rather primarily based his defense on the premise that he had acted impulsively out of anger because the victim had called him by a racist name. In these circumstances, the defendant was not entitled to an intoxication instruction. See *Commonwealth* v. *Fano*, 400 Mass. 296, 307 (1987).

4. There is no basis to grant the defendant's request that his murder conviction be reduced under G. L. c. 278, § 33E, to one of murder in the second degree. The Commonwealth presented an exceptionally strong case showing that the defendant had wilfully participated in the armed robbery which led to the senseless killing of the victim. There is nothing which mitigates the vicious nature of the murder. See *Commonwealth* v. *Oeun Lam*, 420 Mass. 615, 620-621 (1995); *Commonwealth* v. *Prater*, 420 Mass. 569, 585-586 (1995).

*Judgments affirmed.*