Commonwealth *v.* Lennon.

COMMONWEALTH *vs.* JOSEPH LENNON.

Suffolk. December 9, 2011. - October 15, 2012.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & LENK, JJ.

*Homicide. Practice, Criminal,* Capital case, Instructions to jury, Public trial. *Evidence,* Intoxication. *Constitutional Law,* Public trial.

At a murder trial, the judge correctly declined to instruct the jury that they could consider evidence of voluntary intoxication on the question of the defendant's capacity to premeditate deliberately, where there was no evidence that the defendant's condition at the time of the murder approached the level of debilitating intoxication needed for such an instruction. [523]

At a murder trial, the judge properly declined to instruct the jury that they could return a verdict of voluntary manslaughter based on evidence of reasonable provocation or sudden combat, where there was no evidence that the victim said or did anything to the defendant before the defendant attacked him, or that the victim attacked or struck the defendant. [523-525]

A Superior Court judge properly denied a criminal defendant's motion for a new trial, in which the defendant alleged that a closure of the court room during jury selection violated his right to a public trial under the Sixth Amendment to the United States Constitution, where the defendant failed to meet his burden of showing that there was a general or even a partial closure of the court room. [525-528]

INDICTMENT found and returned in the Superior Court Department on September 12, 2006.

The case was tried before *Peter M. Lauriat,* J., and a motion for a new trial, filed on September 7, 2010, was considered by him.

*David H. Mirsky* for the defendant.

*Vincent J. DeMore, III,* Assistant District Attorney (*Gretchen Lundgren,* Assistant District Attorney, with him) for the Commonwealth.

SPINA, J. The defendant was convicted of deliberately premeditated murder. On appeal he asserts error in (1) the judge's refusal to instruct the jury that they could consider evidence of voluntary intoxication on the question of his capacity to pre-

meditate deliberately, (2) the judge's refusal to instruct the jury that they could return a verdict of voluntary manslaughter based on evidence of reasonable provocation or mutual combat, and (3) the denial of his motion for a new trial based on his claim of a closure of the court room during jury selection that violated his right to a public trial under the Sixth Amendment to the United States Constitution. The defendant also asks us to exercise our power under G. L. c. 278, § 33E, to reduce his conviction to murder in the second degree based on the evidence of his diminished capacity to premeditate deliberately. We affirm the conviction and decline to reduce the verdict or order a new trial.[1]

1. *Background.* The jury could have found the following facts. We reserve other details for discussion of particular issues. At approximately 4 P.M. on June 19, 2006, a group of about one-half dozen people was gathered in a park near Faneuil Hall in Boston. The defendant was among them. The victim was sitting on a nearby bench. Suddenly, witnesses heard yelling and observed people fleeing the area — except the defendant and the victim. The defendant walked behind the bench where the victim was sitting, pulled him over the back of the bench, and threw him to the ground. Prior to that, the victim, who was unarmed, had neither struck the defendant nor made any threatening gesture toward him. The defendant yelled at the victim, who was on his back, telling him to "turn over" and "don't you ever, ever fuck with me again." The defendant then thrust a knife into the victim's back and fled the scene, leaving the knife in the victim. The victim was taken from the scene by ambulance to a nearby hospital where he died from the knife wound.

The defendant went to a homeless shelter where he was staying and changed his clothes. He returned to the park about

---

[1]The defendant's direct appeal was entered in this court on March 24, 2009; on September 7, 2010, the court granted a stay of his appeal to allow the defendant to file a motion for a new trial. The motion judge, who was also the trial judge, denied the motion without a hearing. The defendant's appeals from his conviction and the denial of his new trial motion were then consolidated. Following oral argument, on December 22, 2011, the court remanded the case "for the purpose of obtaining findings regarding the defendant's Sixth Amendment claims." The trial judge's findings of fact were subsequently filed in this court on June 22, 2012.

twenty to thirty minutes after the stabbing. Witnesses recognized the defendant and alerted police, who immediately arrested him. Samples of reddish-brown stains from the defendant's hands and a shirt seized from the defendant's room at the shelter were later subjected to deoxyribonucleic acid (DNA) testing and determined to be matches to the victim's DNA.

At about 8 P.M. on June 19, the defendant was taken to an interview room where a detective asked if he would agree to be interviewed. The defendant told the detective that he first wanted to speak to his sister, who is a lawyer. The detective complied and escorted the defendant back to the holding cell. When they arrived at the cell, the defendant changed his mind and said he wanted to talk to the detective at that time without first talking to his sister. After waiving the Miranda rights but declining to have the interview recorded, the defendant told the detective he had purchased a pint of vodka and a bottle of "Ruby Red," which he shared with his girl friend. After drinking for about forty-five minutes, he went out to buy more vodka. The defendant said he then went to look for his girl friend at the park, although the reason for doing so was not clear to the detective. The defendant said he was arrested shortly after he arrived at the park. The interview was terminated after approximately seventeen minutes because the defendant would not respond to further questions asked by the detective. Instead, he talked about his desire to become a preacher after seeing his father bury his brother and quoted the Bible. The detective terminated the interview not because of any apparent condition that rendered the defendant incapable of answering questions, but because he would not answer questions.

The defendant presented the testimony of a vice-president of the shelter, with whom he had met for twenty to thirty minutes about two hours before the stabbing. The witness testified that he thought the defendant's eyes were "glassy" and that the defendant listed to one side while walking. However, the defendant did not stumble or fall, and he repeatedly stood up and sat down without difficulty. The defendant also answered questions and otherwise spoke in an appropriate and coherent manner. Witnesses who observed the defendant at the time of the stabbing, when he went to the shelter minutes later to change his

clothes, when he returned to the park about twenty to thirty minutes after the stabbing, when he was transported to the police station, and when he was photographed at the police station about one hour and ten minutes after the stabbing, testified variously that he was steady on his feet, that his speech was not slurred, and that he was coherent, showed no difficulty understanding what was said to him, and emitted either no odor of alcohol or only a mild odor.

2. *Voluntary intoxication.* The defendant argues that because there was evidence that he was "impaired to any degree by the consumption of alcohol," *Commonwealth* v. *Herbert*, 421 Mass. 307, 316 (1995), he was entitled to an instruction on voluntary intoxication and the judge's refusal to so instruct was error. He has misperceived the above quotation from *Herbert*. The court merely was commenting on the record in that case, which contained *no* evidence of impairment by alcohol. The court was not articulating a standard that *any* evidence of impairment by alcohol entitles a defendant to a voluntary intoxication instruction.

Here, the judge correctly denied the defendant's request to instruct the jury on voluntary intoxication. A jury instruction on voluntary intoxication is required only where there is evidence of "debilitating intoxication" that could support a reasonable doubt as to the defendant's ability to form the requisite criminal intent. See *Commonwealth* v. *Brown*, 449 Mass. 747, 768 (2007); *Commonwealth* v. *DelValle*, 443 Mass. 782, 793-794 (2005); *Commonwealth* v. *Erderly*, 430 Mass. 149, 152 (1999); *Commonwealth* v. *James*, 424 Mass. 770, 789 (1997). Witnesses who observed the defendant at the time of the stabbing and until about one hour and ten minutes after the stabbing all described him as having no difficulty walking, running, speaking, or understanding. He might have been under the influence of alcohol to some degree about two hours before the stabbing, but there is no evidence that his condition at the time of the stabbing approached the level of "debilitating intoxication" needed for an instruction on voluntary intoxication. There was no error.[2]

3. *Voluntary manslaughter.* The defendant asserts error in the

[2]Although the defendant relies on testimony of the detective who interviewed him about four hours after the stabbing that at the end of the interview the defendant's answers were "nonresponsive," the detective made clear that by

judge's refusal to instruct the jury on voluntary manslaughter based on "sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980), quoting *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931).

a. *Reasonable provocation.* A defendant is entitled to an instruction on voluntary manslaughter based on reasonable provocation if, viewing the evidence in the light most favorable to him, "there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). "The evidence must be sufficient to create a reasonable doubt in the minds of a reasonable jury that a defendant's actions were both objectively and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the homicide, and that in fact a defendant was provoked and did not cool off." *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001), quoting *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985). See *Commonwealth* v. *LeClair*, 445 Mass. 734, 740-741 (2006). "Insults and arguments are insufficient provocation for manslaughter." *Commonwealth* v. *Burgess*, 450 Mass. 422, 438 (2008). Here, there was no evidence that the victim did or said anything to the defendant before the defendant attacked him, much less something that would have provoked a reasonable person to lose self-control. The evidence only supports an attack

_____

"nonresponsive" he did not mean to say that the defendant's condition rendered him incapable of comprehending what was occurring. The detective was suggesting a deliberateness or a purposefulness in the defendant's nonresponsiveness. We note that the defendant neither filed a motion to suppress his statement to the detective based on an alleged state of intoxication nor requested a "humane practice" instruction based on his alleged state of intoxication, nor was such an instruction given. The primary defense at trial was mistaken identity, and it was masterfully, although unsuccessfully, executed by highly skilled trial counsel. Voluntary intoxication would not have been consistent with the defense at trial.

by the defendant that was unprovoked. There was no error in the denial of the defendant's request for an instruction on reasonable provocation.

b. *Sudden combat.* Before a defendant is entitled to an instruction on voluntary manslaughter based on sudden combat, there must be evidence that would warrant a reasonable doubt that the victim presented a threat of serious harm to the defendant by attacking him or striking a blow against him. See *Commonwealth* v. *Espada,* 450 Mass. 687, 696-697 (2008); *Commonwealth* v. *Ruiz,* 442 Mass. 826, 838-839 (2004); *Commonwealth* v. *Walden, supra* at 727-728. There is no evidence that the victim attacked or struck the defendant, much less created a risk of serious harm. The defendant cites testimony of one witness who said the two men were "kind of wrestling," but that witness and all the other eyewitnesses placed the defendant above the victim at all relevant times. Even if there was some "wrestling," it was not the type of physical contact that warrants an instruction on voluntary manslaughter. If the victim did anything, he attempted to resist being rolled onto his stomach just before the defendant stabbed him in the back. This did not constitute a threat of serious harm to the defendant. See *Commonwealth* v. *Espada, supra* at 697; *Commonwealth* v. *Ruiz, supra* at 839; *Commonwealth* v. *Walden, supra.* There was no error in the denial of the defendant's request for an instruction on sudden combat.

4. *New trial motion.* The defendant filed a motion for a new trial in which he claimed his Sixth Amendment right to a public trial was violated by closure of the court room during the jury selection process. See *Presley* v. *Georgia,* 130 S. Ct. 721, 723-724 (2010); *Commonwealth* v. *Cohen (No. 1),* 456 Mass. 94, 106 (2010). The defendant relied in large part on the affidavit of one of his sisters, which stated that she had been excluded from the court room during jury selection on September 10, 2007. The motion judge, who also was the trial judge, denied the motion without a hearing, concluding that the defendant presented no credible evidence that anyone had been excluded from the court room, particularly where such information had not been presented to the court, counsel, or the defendant until three years after the trial. We remanded the matter for findings

in specific areas as to whether closure of the court room occurred during the jury selection process. The judge conducted an evidentiary hearing over two days and made written findings that have been filed with the court. See note 1, *supra.* We summarize the judge's findings.

On September 6, 2007, the first day of jury selection, the proceedings adjourned before the 1 P.M. luncheon break, and the court stood in recess until the next day of trial, September 10. On the afternoon of September 6, the defendant and trial counsel were allowed to use the court room as a private conference room, to the exclusion of everyone else except court officers who were charged with the custody of the defendant. Jury selection resumed on September 10 and was concluded before the 1 P.M. luncheon break. The court stood in recess until the next day.

The judge did not ask or direct anyone to leave the court room during jury selection, nor did any court staff person or court officer. No one was denied entry to the court room during jury selection. There was no sign on any court room door that prohibited entry during jury selection, and the door through which the public entered the court room was not locked. The court room was and remained open to the public when the court was in session for jury selection. No court room closure occurred at any time during jury selection.

The defendant's sister who claimed to have been excluded from the jury selection process on September 10 was a postal service employee at the time. Her employment records indicate that she worked from 5:13 A.M. until 2 P.M. on September 6, 2007, and from 5:03 A.M. until 2:05 P.M. on September 10, 2007. On both days, if she walked to the court house, she would have arrived at about 2:30 P.M. However, on each of those days, the court recessed the trial no later than 1 P.M. Consequently, she could not have been excluded from jury selection.

The defendant's other sister, a practicing attorney, had provided some assistance to the defense as early as July 7, 2006. On September 6 and 10, 2007, she was involved in matters for clients in courts outside Suffolk County and was unable to attend the defendant's trial. The defendant's trial counsel would have objected to any closure of the court room at any time, as

to any family member or friend of the defendant or any member of the general public, had he known of such closure. He was not aware of any alleged closure until May 10, 2010, when he was contacted by the defendant's appellate counsel.

"[T]he burden is on the defendant to demonstrate that the public was excluded from his trial." *Commonwealth* v. *Cohen (No. 1), supra* at 107-108, quoting *Commonwealth* v. *Williams*, 379 Mass. 874, 875 (1980). His claim of court room closure is contradicted directly by the judge's findings, both as to the general public and as to his sister who claimed to have been excluded.

The defendant's strongest claim that the judge's findings are clearly erroneous is a parenthetical statement by the court reporter at the end of the transcript for the proceedings on September 10, 2007, to the effect that "[c]ourt recessed at 4:04 P.M." According to the transcript for that day, the judge greeted each potential juror during individual voir dire by saying "good morning." The transcript was only ninety-nine pages long (a very small volume) and, on page eighty-six, indicated an "[i]ndiscernible" statement by the judge at "1:40:49" P.M., after the jury selection process had concluded and before what was to have been the luncheon break. The judge then engaged counsel in a discussion about scheduling that consumed two and one-half pages of transcript. He expressed his frustration that the afternoon session that day could not include his precharge to the jury and opening statements of counsel because opening statements apparently already had been scheduled to take place the next day. This was followed by dismissal of potential jurors who remained in the court room, instructions to the selected jurors as to what they could expect by way of a trial schedule, and cautionary instructions about remaining fair, impartial, and self-quarantine from outside sources of information — all of which comprised about eight pages of the transcript. Another brief conversation with counsel took place that comprised the final two pages of the transcript. It makes no sense that these few, brief events, from the end of the jury selection process to the recess, would have lasted two hours and twenty-four minutes, ending at 4:04 P.M. The judge's finding that jury selection concluded before the luncheon recess is supported by the record and is not clearly erroneous.

The 4:04 P.M. notation can be explained in one of two ways. First, the court reporter might have remained available for emergency work that could be assigned to the trial judge during his "down time" that afternoon, nothing occurred that required her services, and she turned off her computerized recording machine at 4:04 P.M. Second, the time stamp device on the court reporter's machine might not have been functioning properly. There were several "[i]ndiscernible" entries in the transcript, and the printed times that such entries were made are nonsensical: "29:15"; "36:25"; and "37:25." As the defendant acknowledges, the judge also was entitled to rely on his own recollection of the trial. The judge's findings are supported by the record, and we accept them as true. See *Commonwealth* v. *Cohen (No. 1)*, *supra* at 105. We conclude that the defendant has failed to meet his burden of showing there was a general or even a partial closure of the court room. The motion for a new trial properly was denied. See *Commonwealth* v. *Buckman*, 461 Mass. 24, 28-29 (2011), cert. denied, 132 S. Ct. 2781 (2012).

Finally, after remand, the defendant filed a motion for postconviction discovery. The judge took no action on the motion other than to recommend that defense counsel communicate with the general counsel of the Administrative Office of the Trial Court. Defense counsel corresponded with the general counsel and received a statement from the chief court officer as to practices concerning court room closure during empanelment. The statement was not helpful to the defendant. The defendant otherwise did not establish "a prima facie case for relief." Mass. R. Crim. P. 30 (c) (4), as appearing in 435 Mass. 1501 (2001). See *Commonwealth* v. *Tague*, 434 Mass. 510, 519, cert. denied, 534 U.S. 1146 (2001). He received more than he was entitled to receive. There was no error.

5. *Relief under G. L. c. 278, § 33E.* We have reviewed the entire record and discern no basis for reducing the degree of guilt or ordering a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*