## COMMONWEALTH vs. JANLEER POVEZ.

No. 12-P-998.

Worcester. September 16, 2013. - December 31, 2013.

Present: KANTROWITZ, SIKORA, & HINES, JJ.

*Jury and Jurors. Practice, Criminal,* Jury and jurors, Challenge to jurors, Instructions to jury. *Intoxication.*

At a murder trial, the judge erred in allowing the Commonwealth's peremptory challenge of a prospective Hispanic juror, where the judge's statements indicated that she found the reason provided by the Commonwealth (i.e., a concern that the juror might talk about the case with his father, a Federal court house janitor) to be adequate but not genuine. [665-668, 668]

At a criminal trial, the judge did not err in giving a joint venture jury instruction or in declining to give an intoxication instruction. [668]

INDICTMENTS found and returned in the Superior Court Department on June 25, 2008.

The cases were tried before *Janet Kenton-Walker*, J.

*Leslie W. O'Brien* for the defendant.

*Michelle R. King*, Assistant District Attorney (*Lisa Casella*, Assistant District Attorney, with her) for the Commonwealth.

KANTROWITZ, J. Charged with murder in the first degree, the defendant, Janleer Povez, was found guilty of murder in the second degree.[1] He appeals, claiming error in (1) the allowance of a peremptory challenge of a prospective Hispanic juror; (2) the judge's failure to order, sua sponte, a competency examination; and (3) the instructions provided to the jury.[2] As we are

---

[1] The defendant also was charged with two counts of assault and battery by means of a dangerous weapon. The judge allowed the defendant's motion for a required finding of not guilty on one count (shod foot), and the jury convicted him on the other count (knife).

[2] Specifically, the defendant argues that the judge should not have instructed the jurors on joint venture, but she should have instructed them on intoxication and reinstructed them on malice.

constrained to agree with the defendant on his first claim, we reverse.

*Facts.* On April 21, 2008, Jack McGuire was a victim of a drug deal gone wrong. That morning, shortly after midnight, McGuire went to an area known for drug dealing, a parking lot of a local Dunkin' Donuts, to purchase "crack" cocaine. Eventually, he met with Lance Savage, a drug middleman, and asked if Savage could secure one hundred dollars' worth of crack cocaine.[3] Savage called the defendant, who agreed to meet at a convenience store in Worcester. A short time later, the defendant and his girlfriend met Savage and McGuire at the prearranged destination and entered McGuire's car. Savage told the defendant that McGuire wanted "six for a hundred," or six twenty-dollar "rocks" of crack cocaine for one hundred dollars, but McGuire first wanted to "taste it." McGuire then drove the car to a secluded location and sampled the drug.

Satisfied with the "hit," McGuire said, "Let me get the rest . . . ." The defendant handed over the remaining rocks. Suddenly, McGuire pulled a gun from his left side and shouted for the occupants to "[g]et the fuck out the [*sic*] car." The defendant and his girlfriend jumped out. Savage stayed in and a struggle ensued. The defendant shouted to Savage: "Get him, . . . get him. Pull him out the [*sic*] car." Soon both combatants were out of the car and still fighting despite McGuire's attempt to flee.

The defendant entered the fray. At one point, Savage, who was holding McGuire upright, heard the defendant say, "Give me my drugs back, or I'll stab you," and he saw the defendant, who was positioned between McGuire's legs, extend his right arm toward McGuire. When McGuire said, "[O]kay," Savage released him. Savage then jumped in the car and tried to get away, but the car would not start. As Savage got out of the car, he noticed the drugs on the driver's side seat and grabbed them. The defendant shouted at Savage, "Give me that rock, or I'll

---

[3]Savage testified at trial as a witness for the Commonwealth. In exchange, he agreed to plead guilty to a reduced charge of manslaughter with a sentence of time served. In addition, he agreed to plead guilty to two charges of assault and battery by means of a dangerous weapon, for which he would be placed on probation, a condition of which was undergoing drug evaluation and treatment.

stab you." Savage handed over the drugs, and the defendant, along with his girlfriend, ran from the scene.

McGuire went to the driver's side of the car, bumped into Savage, got into the car, and uttered, "I'm dying, I'm dying." Savage looked down and saw a pool of blood at his feet. Startled, he turned and ran in the same direction as the defendant. From a distance, he saw the defendant and his girlfriend turn into, but not enter, a brown rooming house. After unsuccessfully trying to enter the building, Savage went to an apartment of an acquaintance, but soon left to use a pay telephone from which he called the defendant. The two spoke briefly. Savage eventually returned to the acquaintance's apartment and picked up a coat, and then he went to Dunkin' Donuts and purchased some drugs for himself.

When he was walking away from Dunkin' Donuts, Savage saw another acquaintance and jumped into her car. As the car drove away, Officer Joseph Essex of the Worcester police department, who had been patrolling the area, stopped the car. Officer Essex testified that the "area itself is a high crime area, known for drugs and prostitution," and that he saw the car pull over and Savage get into the back seat, a behavior similar to that of middlemen who "take the people who are driving up and down the street to get drugs." Essex approached the driver and asked her what she was doing. The driver told him that she was taking her friends (Savage and another man in the car) home. The driver, however, was unable to name either man. Officer Essex then asked the men to step out and he performed a patfrisk, a brief pat-down of the outer clothing, to check for weapons and to ensure officer safety. The officer, thinking it was odd that Savage wore a bulky winter jacket in mild weather, unzipped the jacket. The officer saw blood on Savage's shirt and asked him what it was. Savage said that he had cut his hands earlier. Although there were no cuts on Savage's hands, Officer Essex did not ask any further questions and let the three go after checking for, and not finding, any outstanding warrants. About two hours later, Officer Essex was called to assist at the McGuire crime scene.

After securing the perimeter of that scene, Essex spoke with Sergeant Gary Quitadamo of the Worcester police department about the stop that Essex had made earlier involving Savage. Sergeant Quitadamo advised Essex to make a report of the stop

and directed a detective to be on the lookout for Savage. Not long after, Savage was arrested. During questioning by the police, Savage identified the defendant from a photograph.

Worcester police Officer Michael Foley was assigned to look for the defendant. While patrolling transportation hubs, Foley spotted an "NYC Express" van and approached the vehicle. When questioning the driver, Foley saw a man who resembled the defendant in the van. Foley returned to his cruiser to get a photograph to verify the identification; as he was doing so, the van was driven away. After confirming the identification, Foley followed the van, pulled it over, and arrested the defendant.

*Jury empanelment.* During the second day of jury empanelment, the Commonwealth exercised a peremptory challenge against juror no. 68, a Hispanic male.[4] Counsel for the defendant questioned the challenge. He noted that juror no. 68 was one of two Hispanics in the remaining jury pool and there were no Hispanics on the jury. The judge responded, "I think at this point, I think there's enough of a basis to ask for a neutral reason as to what was the basis for [the challenge]." After the following exchange took place, the judge allowed the challenge to stand and excused the juror.

> FIRST PROSECUTOR: "[The juror] explained that his father works at the federal courthouse. My concern is that there could be some talk to dad, what's the real story with this, people who are in custody, people who aren't in custody — any sort of 'inside baseball.' I was concerned that just because he's going to probably tell his dad 'I'm on a jury,' they might start chitchatting about it. So, I felt like I didn't want him on the jury, anyway; and he was part of the court system, really."

> THE COURT: "Well, he said his father works as the janitor in the federal courthouse here in Worcester."

> DEFENSE COUNSEL: "There's no issues of federalism in this case, judge."

> SECOND PROSECUTOR: "But courthouse procedures, and —"

---

[4]The defendant also is Hispanic.

FIRST PROSECUTOR: "Exactly — people coming in from custody, out of custody, court officers, all of that."

THE COURT: "I don't know; that doesn't cut it with me, commonwealth. I mean, there are all kinds of people that work in the court system. It would be one thing if his father was working as a clerk in the federal court, and they had discussions on a regular basis about how the court system works, but the fact that this man is a janitor in a court — he doesn't know anything more than anybody else, necessarily, about how this court works, particularly if it's federal. I don't find that as a legitimate reason for excusing him."

FIRST PROSECUTOR: "No; it has nothing to do with whether it's federal or state. It's just kind of the inside dealings of a courthouse, that there will be people who are in custody who will be coming into the courtroom, out of the courtroom — all of that. I'm just concerned that if he goes home and chitchats about it, that there might be more speculation than anything else."

DEFENSE COUNSEL: "Well, there's going to be an instruction not to discuss the case with anyone."

THE COURT: "I just don't find that explanation to be genuine. That doesn't exclude him. I can't say one way or the other as to whether or not he is being excluded because of his affiliation to being Hispanic, but I find the basis of the peremptory as being somewhat tortured, to say the least."

FIRST PROSECUTOR: "That's my notation: 'Dad at federal courthouse.' "

THE COURT: "Well, I'll make a finding that is clear and reasonably specific that it is personal to that juror, and it's not necessarily based on the juror's affiliation. As to whether or not it's genuine, I have some — while I have some reservations about it, because I don't feel that it's a pretext because of his group affiliation, I'm not going to strike the challenge, and I'll allow the challenge to stand. The commonwealth is on notice about it. Your objection is noted."

*Peremptory challenges.* The principles surrounding peremptory challenges are well known, see *Commonwealth* v. *Douglas,* 75 Mass. App. Ct. 643, 648-650 (2009), but difficult to implement, see *Commonwealth* v. *Rodriguez,* 457 Mass. 461, 488 (2010) (*Rodriguez*) (Marshall, C.J., concurring) (noting "the impossible task of scrutinizing peremptory challenges for improper motives"), overruled on another ground by *Marshall* v. *Commonwealth,* 463 Mass. 529, 535 (2012). See Agnes, Peremptory Challenges in Massachusetts: Guidelines to Enable the Bench and the Bar to Comply with Constitutional Requirements, 94 Mass. L. Rev. 81 (Aug. 2012).

In a nutshell, "[t]here is no dispute that Hispanic persons are members of a racial or ethnic group protected under art. 1 of the [Massachusetts] Declaration of Rights . . . and under the equal protection clause of the Fourteenth Amendment to the United States Constitution." *Rodriguez, supra* at 467 n.15 (majority opinion) (citations omitted). A peremptory challenge to exclude a juror because of his membership in a discrete group is prohibited. *Commonwealth* v. *Benoit,* 452 Mass. 212, 217-218 (2008) (*Benoit*), citing *Commonwealth* v. *Soares,* 377 Mass. 461, 486-488, cert. denied, 444 U.S. 881 (1979), and *Batson* v. *Kentucky,* 476 U.S. 79, 84-88 (1986).

While a peremptory challenge is presumed proper, it may be rebutted by a showing of (1) a pattern of excluding members of a discrete group; and (2) a likelihood that the exclusion occurred solely because of their membership in that group. *Benoit, supra* at 218. A pattern, however, is not required when "only one or two members of a discrete group have been challenged and the venire contains only a few members of the group." *Commonwealth* v. *Garrey,* 436 Mass. 422, 429 (2002). "Once an issue is raised concerning an improper use of a peremptory challenge, 'the judge must make a finding as to whether a prima facie showing of an improper use . . . has been made.' " *Rodriguez, supra* at 471, quoting from *Commonwealth* v. *Maldonado,* 439 Mass. 460, 463 (2003) (*Maldonado*). When such a showing is made, the "burden shifts to the Commonwealth to 'provide a group-neutral reason for [the challenge].' " *Benoit, supra* at 219, quoting from *Commonwealth* v. *Burnett,* 418 Mass. 769, 771 (1994) (*Burnett*).

At that point, the prosecutor must provide "a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." *Benoit, supra* (quotations and citation omitted). The judge is then "required to make an independent evaluation of the prosecutor's reasons and to determine specifically whether the explanation was bona fide or a pretext." *Commonwealth* v. *Calderon,* 431 Mass. 21, 26 (2000). See *Maldonado, supra* at 464. An explanation will be found bona fide if it is both adequate and genuine. *Ibid.*

"An explanation is *adequate* if it is 'clear and reasonably specific,' [and] 'personal to the juror and not based on the juror's group affiliation . . . .' " *Id.* at 464-465, quoting from *Burnett, supra.* "Challenges based on subjective data such as . . . a party's 'gut' feeling should rarely be accepted as adequate because such explanations can easily be used as pretexts for discrimination." *Maldonado, supra* at 465. "An explanation is *genuine* if it is in fact the reason for the exercise of the challenge. The mere denial of an improper motive is inadequate to establish the genuineness of the explanation." *Ibid.* The explanation must "reflect[] the challenging party's actual thinking." *Ibid.*

The ultimate ruling on the challenge will be reviewed with "substantial deference to the [judge's] decision." *Burnett, supra.* However, the record must reflect "consider[ation of] both the adequacy and the genuineness of the proffered explanation." *Maldonado, supra.* "The appellate court must . . . be able to ascertain that the consideration . . . was itself adequate and proper." *Id.* at 466. Furthermore, the record must "explicitly contain the judge's separate findings as to both adequacy and genuineness and, if necessary, an explanation of those findings." *Ibid.*

Here, the judge, to her credit, followed the required procedures when counsel sought an explanation for the challenge. After defense counsel noted that juror no. 68 was one of two Hispanics in the remaining jury pool and that there were no Hispanics on the jury, the judge, implicitly finding a prima facie showing of impropriety, asked the Commonwealth to provide a race-neutral reason for the challenge. See *Commonwealth* v. *Van Winkle,* 443 Mass. 230, 236 (2005) ("Where a venire contains a paucity of [a protected class,] a judge has broad discretion to

require an explanation without having to make the determination that a pattern of improper exclusion exists" [quotations and citation omitted]). See also *Commonwealth* v. *Scott*, 463 Mass. 561, 570-571 (2012) ("[B]y requiring a prosecutor to provide an explanation for making a peremptory challenge, a judge may have implicitly found that a defendant has made a prima facie showing that challenge was improper"). The prosecutor explained that she was concerned the juror might talk about the case with his father, a Federal court house janitor.

The Commonwealth claims that the judge's subsequent "statements clearly reflect her conclusion that the reason given was both adequate and genuine." We disagree. While the judge's statements that the reason was clear, specific, and personal to the juror indicate that she found the reason adequate, her statements do not indicate that she found the reason genuine. In fact, the judge expressly stated that she did not find the reason genuine. The Commonwealth suggests that the judge's ultimate finding that the challenge was not a pretext, in effect, was a finding that the proffered reason was genuine. This suggestion conflicts with the judge's statements and conflates the analysis. Cf. *Maldonado*, 439 Mass. at 465-466. Further, given the apparent conflict between the judge's subsidiary finding that the reason was not genuine and her ultimate finding that the challenge was not a pretext for discrimination, an explanation was necessary. See *Benoit*, 452 Mass. at 222 (findings should not simply state conclusions). Without such an explanation, we are left with a record reflecting a generally unacceptable basis for exclusion. See *Maldonado*, *supra* at 466.

We agree with the judge's original thoughts and concerns, adding that we are at a loss to understand how the juror's father, due to his employment as a janitor in a Federal court house, would be of any legitimate concern to the Commonwealth, especially since the juror would be instructed, as ably noted by defense counsel, not to discuss the case with anyone.[5] *Commonwealth* v. *Lynch*, 439 Mass. 532, 544, cert. denied, 540 U.S.

---

[5]Indeed, the judge did just that, telling the jury: "Don't talk about this case or any aspect of this case with anyone — your spouses, your family, your friends, your neighbors, your children, acquaintances, employers, employees, enemies, strangers, anybody out there, or even amongst yourselves. . . . All

1049 (2003) (jurors are presumed to follow the directions of the judge).

*Remaining issues.* We need not dwell on the defendant's remaining issues. Briefly, because there was some evidence from which the jury could have concluded that at least two persons were involved in the crime, the judge did not err in giving a joint venture jury instruction as outlined in *Commonwealth* v. *Zanetti,* 454 Mass. 449, 470 (2009) (Appendix). Nor did the judge err in declining to give an intoxication instruction given the defendant's lack of a "debilitating" condition. *Commonwealth* v. *Lennon,* 463 Mass. 520, 523 (2012).[6]

*Conclusion.* "[T]he defendant has an unquestionable right to be tried before a jury that has been selected in a manner that is free from discrimination, and this right was not adequately protected in the present case." *Benoit, supra* at 226. We recognize that in this day and age, with attorneys being sensitized to the issue at hand, that the vast majority of prosecutors act aboveboard and harbor no racial bias. However, even the appearance of such impropriety is problematic, given the important role that race and ethnicity play in the assessment of the jury selection process. See *id.* at 225.

*Judgments reversed.*

*Verdicts set aside.*

---

right; and again, don't let anybody else tell you what they may have found, or seen, or heard." On the first day of trial, the judge again instructed the jury, stating: "Please do not talk to anyone . . . about any aspect of this case during the trial . . . ."

[6]Given the posture of the proceedings, the judge's observations of the defendant, and the lack of a request by trial counsel, there was no need to order, sua sponte, a competency evaluation. Finally, the judge properly responded to a jury question and was not required to reinstruct on malice. See *Commonwealth* v. *Stokes,* 440 Mass. 741, 750 (2004).