NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1950                                            Appeals Court

COMMONWEALTH  vs.  JOHN LACOY.

No. 13-P-1950.

Suffolk.     February 1, 2016. - October 6, 2016.

Present:  Trainor, Meade, & Sullivan, JJ.

Homicide.  Practice, Criminal, Challenge to jurors, Jury and
     jurors, Assistance of counsel, Opening statement,
     Instructions to jury.  Jury and Jurors.  Evidence, Prior
     misconduct.

Indictment found and returned in the Superior Court
Department on September 29, 2011.

The case was tried before Raymond J. Brassard, J.

Neil L. Fishman for the defendant.
Matthew T. Sears, Assistant District Attorney (Ursula A.
Knight, Assistant District Attorney, with him) for the
Commonwealth.

SULLIVAN, J.  After a jury trial, the defendant, John

Lacoy, was convicted of murder in the second degree.  See G. L.

c. 265, § 1.  On appeal, he contends that (1) the Commonwealth's

exercise of two of its peremptory challenges violated art. 12 of

the Massachusetts Declaration of Rights and the equal protection

clause of the United States Constitution; (2) trial counsel was ineffective; (3) prior bad acts were admitted in error; and (4) the judge erred by declining to instruct the jury on sudden combat theory of voluntary manslaughter and involuntary manslaughter. We affirm.

Background. We recite the facts as the jury could have found them, noting facts that are disputed, and reserving certain details for our analysis of the issues raised on appeal.

The defendant and the victim, Casey Taylor, met in a homeless shelter. After the defendant found an apartment with two other men, Taylor stayed with him overnight from time to time. The landlord[1] eventually told the defendant that Taylor was not to come to the house any more. The defendant did not allow Taylor to leave the bedroom or make noise on those nights when the landlord was at home, and required Taylor to urinate in a bottle.

Both men were alcoholics. Over the course of the two years that they knew each other, Taylor sought out the defendant after the defendant's Social Security disability check had arrived. Taylor wanted money to purchase alcohol. When the defendant received his disability check, the two men were seen on the back porch of the apartment with large bottles of vodka for days at a time. When the alcohol was gone, Taylor left.

---

[1] One of the men in the apartment was the landlord.

The defendant told friends that he was interested in Taylor sexually, even though Taylor was straight. Nine months before Taylor's death, in a recorded telephone call, the defendant told a friend that he had put pills in the victim's vodka because he wanted to "molester" him.[2] The defendant, who testified at trial, admitted that he drugged Taylor because he felt used, and that he was angry. The defendant also admitted that he sexually assaulted Taylor after Taylor drank too much and "blacked out." He tried to justify his actions by pointing to Taylor's habit of using the defendant for his money. He also said that sex was sometimes consensual.

The defendant referred to the victim as a leech, meaning, in the defendant's words at trial, "he used me a lot" and "he wanted me for my money." At trial, the defendant admitted that he had threatened to beat up the victim, to hit him over the head with a beer bottle, and to steal his money. Several months before the murder he told one friend, "If he shows up here I'll murder him."

On the night of July 31, 2011, the defendant and Taylor were alone in the defendant's bedroom. A neighbor overheard part of an argument coming from the bedroom, during which the

---

[2] Various electronic mail messages and recordings of telephone calls were kept by a friend of the defendant. Additional recorded telephone calls, made while the defendant was in jail, were also admitted.

defendant yelled, "I'm sick of you being a leech[.] I'm sick of supporting you[.] [L]ook at you now[.] I'm feeding you now." There was an altercation, during which the defendant stabbed Taylor in the chest with a knife, perforating his heart. Taylor cried out, "Call 9-." Instead of calling for help, the defendant dragged Taylor out of the bedroom, down the stairs, and outside the house, and left him to die underneath a latticework enclosure around the stairs that led to the back porch.

The defendant then went back to the bedroom where the stabbing had taken place. He flipped over the bloody mattress, removed and disposed of the bloody sheets and the knife, and fled. Nine days later, Taylor's decomposing body was discovered after several complaints were lodged that a foul, "nauseating" smell was coming from somewhere near the defendant's residence.

The cause of death was a single stab wound to the heart. At trial, the issue before the jury was whether the killing was committed with the requisite intent to sustain a charge of murder in the second degree or involuntary manslaughter, or whether the killing was done in self-defense or was accidental.

Needing a place to go and wanting to "hide," the defendant checked himself into Beth Israel Hospital, professing to be

suicidal.[3] His stated reason for admission was that he felt depressed and drank too much, and too many people were leeching off him. Once admitted, the defendant told a nurse about the stabbing. The defendant said that he had become "annoyed" with Taylor when Taylor had asked him to buy more vodka, and that he then punched Taylor. Taylor bit the defendant's finger and punched the defendant, and the defendant then stabbed Taylor, who ran away. He told a similar story to a friend, claiming that Taylor had run away. He told another friend that he and Taylor had passed out on the beach and that Taylor may have been swept out with the tide.

During his stay at the hospital, the defendant sent an electronic mail (e-mail) message to a friend stating "I heard they found Taylo[r's] courpse [sic][.] I'm glad[.] No[w] he will not leach [sic] off me anymore[.]" The e-mail was sent six days before Taylor's body was discovered by the police.

The defendant lied to his friends about Taylor's whereabouts, and about how (and whether) Taylor had died, even after Taylor's body was discovered at the defendant's residence on August 9, 2011. Recorded telephone calls were introduced at trial, in which the defendant admitted to killing Taylor and

---

[3] The defendant told a friend that he needed a place to stay so he was going to check himself into Beth Israel Hospital and say that he was suicidal. The defendant told his mother that he was going there "to hide."

said that he would "make stuff up."[4]  On August 16, 2011, fifteen days after the killing, and seven days after the discovery of the body, he admitted to one friend that he had "got [Taylor] once . . . right under the heart" and "dragged him down the back stairs, threw him underneath."

The theory of the defense was that the stabbing was either in self-defense or accidental.  The defendant testified that he purchased alcohol on the day of the killing.  He and Taylor drank together at the defendant's home, and then went to the beach and drank some more.  Upon their return to the defendant's home, the defendant prepared chicken for the two of them.  He brought the plate of chicken, together with a knife and fork, to the defendant's bedroom, where Taylor was waiting.  Complaining that he wanted more "booze," Taylor threw the plate of food across the bedroom, and then attacked the defendant with a metal box fan, hitting him in the shoulder and the side of his head. Taylor jumped on top of the defendant, tried to strangle him, and bit one of his fingers.  At that point, the defendant pulled his finger from Taylor's mouth, and the knife that the defendant brought with the chicken "fell into his body accidentally."  The

---

[4] During his first interview with the police, the defendant stated that he did not know Taylor.  When pressed, he said "I don't know him very well.  I might have met him."  At trial, the defendant testified that had lied to the police, and that he had known Taylor about two years.

defendant also testified that he stabbed Taylor "to get him off of me" and that he was "protecting himself from getting killed."

Discussion. 1. Peremptory challenges. The defendant contends that the judge's allowance of the Commonwealth's peremptory challenges of an African-American female juror (juror 165) and a gay African-American male juror (juror 179) denied him his right to a jury selection process free from invidious discrimination. "The use of peremptory challenges to exclude prospective jurors solely because of bias presumed to derive from their membership in discrete community groups is prohibited both by art. 12 [of the Massachusetts Declaration of Rights] . . . and the equal protection clause [of the United States Constitution]." Commonwealth v. Issa, 466 Mass. 1, 8 (2013) (citations and quotation omitted). See Commonwealth v. Soares, 377 Mass. 461, 486-488, cert. denied, 444 U.S. 881 (1979); Batson v. Kentucky, 476 U.S. 79 (1986) (Batson). "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." Foster v. Chatman, 136 S. Ct. 1737, 1747 (2016) (quotation omitted).

A defendant may "object to the use of a peremptory challenge without regard to whether the defendant and the excused juror are of the same race." Sanchez v. Roden, 753 F.3d 279, 292 (1st Cir. 2014), citing United States v. Mensah, 737 F.3d 789, 797 (1st Cir. 2013), cert. denied, 134 S. Ct. 1912

(2014).  See <u>Powers</u> v. <u>Ohio</u>, 499 U.S. 400, 402 (1991) (<u>Powers</u>). The defendant is entitled to a choice of jurors free of the taint of racial bias.  <u>Miller-El</u> v. <u>Dretke</u>, 545 U.S. 231, 237-238 (2005).  The defendant is also entitled to assert the right of each juror to sit under the equal protection clause of the United States Constitution.  <u>Powers</u>, <u>supra</u> at 415.

"There is a presumption that the exercise of a peremptory challenge is proper.  That presumption may be rebutted, however, if [the objecting party shows] that (1) there is pattern of excluding members of a discrete group; and (2) it is likely that individuals are being excluded solely because of their membership in this group."  <u>Commonwealth</u> v. <u>Benoit</u>, 452 Mass. 212, 218 (2008) (<u>Benoit</u>).  In addition, "[a] single peremptory challenge may be sufficient to make a prima facie showing," where the circumstances of the challenge so indicate.  <u>Ibid</u>. "Once an issue is raised concerning an improper use of a peremptory challenge, 'the judge must make a finding as to whether a prima facie showing of an improper use . . . has been made.'"  <u>Commonwealth</u> v. <u>Rodriguez</u>, 457 Mass. 461, 471 (2010) (<u>Rodriguez</u>), quoting from <u>Commonwealth</u> v. <u>Maldonado</u>, 439 Mass. 460, 463 (2003) (<u>Maldonado</u>).[5]

---

[5] "We have stressed the importance of this task, noting that 'an appellate court must be able to discern from the record whether the preliminary finding has been made, one way or the

If that showing is made, the burden shifts to the party making the peremptory challenge to "provide a group-neutral reason." Benoit, supra at 219 (citation omitted). The proponent of the challenge "must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." Commonwealth v. Burnett, 418 Mass. 769, 771 (1994), quoting from Batson, supra at 98 n.20. To be bona fide, reasons must be both "adequate" and "genuine." Benoit, supra at 219-220. "The judge should make 'specific findings' or provide an 'explanation' ascertainable to an appellate court concerning whether the reason for removal offered by the challenging party is both adequate and genuine." Rodriguez, supra at 471, quoting from Maldonado, supra at 465-466.

a. Juror 165. After the individual voir dire of juror 165, an African-American woman, the Commonwealth exercised a peremptory challenge.[6] The judge, sua sponte, noted that the Commonwealth had already challenged "one black female and one black male[, a]nd this would be the second black female."[7] The

_____

other.'" Rodriguez, supra at 471, quoting from Maldonado, supra at 463 n.5. Oral findings are sufficient for this purpose.

[6] Defense counsel did not challenge the juror for cause and had said the juror was acceptable.

[7] At the time of the challenge, the Commonwealth had exercised four peremptory challenges, of which three were directed to African-American jurors. Of the twenty-nine jurors

judge sought an explanation, and the prosecutor offered one: that the juror worked at Beth Israel Hospital, the hospital to which the defendant had been admitted. After expressing some skepticism about the explanation given, but accepting its truth, the judge allowed the challenge, stating, "[W]ere we involved with a [d]efendant that [sic] was African American I would not permit the challenge. But here I will. Although I think it's very marginal. Okay."[8] Defense counsel did not object at any time. See Rule 6 of the Rules of the Superior Court (1989).[9]

---

questioned to that point, fifteen had been excused for cause, the defense challenged three, and seven jurors had been seated.

[8] The full colloquy is as follows:

Judge: "I can't imagine what the racial basis, conscious or unconscious would be. Because the Defendant appears to be a person of Caucasian heritage. Is that right, [defense counsel]?"

Defense counsel: "I didn't hear the last part."

Judge: "The Defendant is a person of Caucasian heritage."

Defense counsel: "He does [sic], yes."

Judge: "Yes, I'm just asking. But there is a little bit of a pattern there that's concerning to [prosecutor]."

Prosecutor: "Nothing to do with race, Your Honor. I can tell you more specifically."

Judge: "Yes?"

Prosecutor: "[Juror 165] works at the Beth Israel Deaconess [Hospital]. There are medical records, that is where the Defendant checked himself into. And so I just

The defendant, citing Powers, supra, contends that the judge's ruling was error because it was based on the mistaken premise that a white defendant is not entitled to make a Soares-Batson challenge.[10]  Looking at the colloquy as a whole, see note

don't want there to be any sort of -- if you were to [sic] overlap between what occurred with him checking himself into Beth Israel and her position there."

Judge:  "That seems like an awfully attenuating concern?"

Prosecutor:  "It's just a concern, Your Honor. It really is a legitimate concern."

Judge:  "Yes, I don't have any reason to doubt the truth of what you say.  I accept that.  It's a marginal reason to exercise a peremptory.  But were we involved with a Defendant that [sic] was African American I would not permit the challenge.  But here I will.  Although I think it's very marginal.  Okay."

[9] General Laws c. 234, § 32, as in effect at the time of trial, purported to permit a challenge to an "irregularity" in the "impanelling" of jurors at any point until the verdict.  No objection was lodged before the verdict, and we need not address the relationship between the statute and Superior Court rule 6 and cases arising thereunder.  General Laws c. 234 was repealed in 2016 and replaced with amendments to G. L. c. 234A.  See St. 2016, 36, § 1 (approved February 10, 2016).  Section 32 was not retained in the amendments to G. L. c. 234A.

[10] The truncated nature of the judge's findings leaves room for misinterpretation.  We take this opportunity to emphasize the importance of making clear findings at each stage of the Soares-Batson inquiry.  See Commonwealth v. Rodriquez, 457 Mass. 461, 471 (2010); Agnes, Peremptory Challenges in Massachusetts: Guidelines to Enable the Bench and the Bar to Comply with Constitutional Requirements, 94 Mass. L. Rev. 81 (2012) (including a checklist of findings).  In the absence of such findings, the judge's ruling receives no deference, and the appellate court reviews the ruling de novo.  See Rodriguez, supra at 472-473.

8, supra; note 12, infra, there are two possible interpretations of the judge's ruling. The first is that the experienced judge raised, sua sponte, the issue of discriminatory peremptory challenges. He mentioned the possibility of both conscious and unconscious bias -- clearly a nuanced approach to the challenge.[11,12] He made a finding of a pattern, and made findings on genuineness and adequacy under the second prong of Soares-Batson. That is, he would have found the explanation inadequate and therefore discriminatory if the defendant had been African-American, but did not find the marginal reason offered to be discriminatory where the defendant was white. As the Supreme Court stated in Powers, supra, "Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred. But to say that the race of the defendant may be

---

[11] Later, during the colloquy concerning juror 179, the judge stated that there was no "racial issue" in the case, but went on to consider other aspects of the challenge, thus indicating that the race of the defendant was one factor he would consider. The judge specifically described the sexual orientation of juror 179 as "a factor." See note 12, infra.

[12] The judge also conducted a voir dire of the jurors to identify any bias on the basis of sexual orientation, and instructed the jurors that sexual orientation should not play a role in their deliberations.

relevant to discerning bias in some cases does not mean that it will be a factor in others, for race prejudice stems from various causes and may manifest itself in different forms." Id. at 416. One possible view of the judge's ruling is that it was not based on an error of law or impermissible considerations.

Alternatively, even if we were to read the judge's ruling to give inadequate consideration to the juror's right to sit, or to a white defendant's entitlement to raise a Batson challenge (as the defendant urges us to do), counsel's failure to object to the judge's ruling poses an additional appellate challenge.[13] Batson held that, on remand, if the prosecution's peremptory challenges were found to be discriminatory, relief would be required without a showing of prejudice. Batson, 476 U.S. at 100. However, in Batson there was "timely objection." Ibid. In the absence of objection, "even structural errors can be waived when they are not properly preserved." Commonwealth v. Petetabella, 459 Mass. 177, 186 n.9 (2011) (in dicta, discussing waiver of exclusion of women from jury).[14] Cf. Commonwealth v.

---

[13] The defendant argues, without citation to authority, that the fact that the judge raised the issue is sufficient to preserve it. However, his objection on appeal is not to the fact that the judge raised the issue, but to how he ruled on it. The defendant was obligated to object to the judge's ruling "at the time the ruling or order of the court is made or sought." See Mass.R.Crim.P. 22, 378 Mass. 892 (1979).

[14] The defendant asserts that he is entitled to relief without a showing of prejudice because racial bias in jury

Burnett, 428 Mass. 469, 476 (1998) (waiver of error in reasonable doubt instruction; "structural error objections can be waived"); Commonwealth v. Vargas, 475 Mass. 338, 357 (2016) and cases cited (waiver of right to public trial).  Here the defendant did not object at any time during trial, and did not signal in any way that he was dissatisfied with the judge's decision.

---

selection is structural error -- a question we need not reach in light of our disposition.  The United States Supreme Court has not explicitly held that Batson error is structural error, although several Federal cases have touched on the question. See, e.g., Winston v. Boatwright, 649 F.3d 618, 628-629 (7th Cir. 2011) (erroneous denial of defendant's Batson objection is structural error).  Cf. Vasquez v. Hillery, 474 U.S. 254, 263-264 (1986) ("discrimination [on the basis of race] in the [selection of the] grand jury undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review"); Batson, supra at 84 n.3, quoting from Alexander v. Louisiana, 405 U.S. 625, 626 n.3, (1972) ("The basic principles prohibiting exclusion of persons from participation in jury service on account of their race 'are essentially the same for grand juries and for petit juries'"). But see Rivera v. Illinois, 556 U.S. 148 (2009) (erroneous denial of defendant's peremptory challenge on Batson grounds is not structural error).  Several Federal circuit courts have held that a Batson objection must be made during voir dire, or at the latest before the venire has been dismissed, or it is waived. See United States v. Reid, 764 F.3d 528, 533 (6th Cir. 2014) (and cases cited).

As a matter of State law, the Supreme Judicial Court has held that "structural error is error that denies a defendant his right to an impartial adjudicator, be it judge or jury." Commonwealth v. Hampton, 457 Mass. 152, 163 (2010) (quotation and citation omitted).  Structural error exists where it is shown that a seated juror was biased.  Ibid.  The court has not addressed whether improper jury selection criteria based on a protected class is structural error.  Id. at 163 n.9.

Accordingly, even if there were error, the objection was waived. We review for a substantial risk of a miscarriage of justice. See generally Commonwealth v. Berardi, 88 Mass. App. Ct. 466, 473 (2015). There is no evidence of the racial composition of the venire or the jury panel. There is no evidence that the jury seated was unrepresentative, unfair, or biased in any way. The defendant has not shown that there is a "serious doubt" as to the impartiality of the jury, and has therefore not demonstrated a substantial risk of miscarriage of justice. See Commonwealth v. Millien, 474 Mass. 417, 432 (2016).

b. Juror 179. On the first day of jury empanelment, juror 179, a gay African-American man, was seated on the jury without challenge. On the second day of empanelment, after the Commonwealth had an opportunity to check the probation records of the jurors seated on day one, the Commonwealth alerted the judge that juror 179 had a more extensive criminal record than he had reported. The defendant stated on his juror questionnaire that he had been charged with disorderly conduct, a charge which was dismissed. However, his probation record revealed that he had also been charged with several other crimes, including four assault and battery offenses, one with a dangerous weapon; two larceny offenses; a compulsory insurance violation; a number plate violation; resisting arrest; and

malicious destruction of property, all of which had been continued without a finding, dismissed, or withdrawn.  Two restraining orders had been issued against him.

The judge conducted a voir dire of the prospective juror. When asked about the other charges, juror 179 responded that he did not list them in the questionnaire because they had been dismissed.  The Commonwealth exercised a peremptory challenge, arguing that the omissions were substantial, and the restraining orders were not reported at all.  The defendant objected, noting that the restraining orders "go back six, seven years," that it was understandable for juror 179 to omit charges that were dismissed or withdrawn, and that "one gay on the jury would be, you know, helpful to talk with the jury."

The judge concluded that the reason given by the prosecutor was the true reason for the challenge, was based solely on the juror's inaccurate reporting, and was not a pretext for discrimination on the basis of sexual orientation.[15]  These

---

[15] The judge made initial findings after hearing from the prospective juror.  "The record should reflect that [juror 179] appears to be an African American gentleman.  We don't have any racial issue in this case.  To my understanding, the defendant is Caucasian, and I gather Mr. Taylor is Caucasian as well. . . .  I think I remember [juror 179] saying he was gay. . . .  So, that seems to me a factor in scale [sic] here. . . .  [T]his is a case involving apparently at least the defendant, who is homosexual, and I gather there's going to be some dispute about whether or not Mr. Taylor was heterosexual or homosexual.  And, so, this is a bit sensitive."

findings addressed both the soundness of the rationale proffered, and the genuineness of the reasons given. The reasons were specific to the juror and unrelated to whether he was gay[16] or black. In light of the nature of the offense, the omission of the restraining orders was particularly relevant. The judge did not abuse his discretion in excusing the juror. See Rodriguez, 457 Mass. at 473-474 (dismissal of juror for

---

After hearing from the parties, the judge made further findings on the record: "[I]s the peremptory grounded in some way in a demographic type characteristic, here sexual preference[?] . . . I find under the [Supreme Judicial Court] case that requires me to evaluate both the ground asserted here as well as the truthfulness of the ground asserted, I find that the ground asserted is the actual ground on which [the prosecutor] puts forward the challenge. I do not think it's a pretext to challenge a man who happens to be homosexual. I think it's grounded legitimately in the accuracy of his report on the [probation record], and I find no reason to doubt the sincerity of the government's challenge. So, I am going to permit that challenge. . . . I find, that the government's challenge is not based on the juror's expressed sexual preference, but rather is grounded solely in the juror's unreliability, inaccurate report of his prior experience with the criminal justice system."

[16] The scope of protection under Soares extends to all groups falling under the Equal Rights Amendment, that is group affiliation based on "sex, race color, creed or national origin." Soares, 377 Mass. at 488 n.33, quoting from Article I of the Declaration of Rights of the Constitution of the Commonwealth, as amended by art. 106 (1976). The judge considered the applicability of Soares and concluded that Soares should apply to peremptory challenges based on sexual orientation. Because the challenge here was proper, we assume, without deciding, that Soares also extends to sexual orientation. Cf. SmithKline Beecham Corp. v. Abbott Labs., 740 F.3d 471, 486 (9th Cir. 2014) (extending Batson to peremptory challenges based on sexual orientation under the Federal equal protection clause).

failing to disclose her own experience with violent crime and her son's prior criminal record).

2.  Ineffective assistance of counsel.  The defendant argues that defense counsel's "weird and bigoted dwelling on defendant's homosexuality" in his opening statement and closing argument constituted ineffective assistance of counsel.[17]

The prosecutor began her opening statement with the following sentence:  "Ladies and gentlemen, words cannot prepare you for what you are about to hear."  She then summarized the facts in outline form, emphasizing the nonconsensual sex between the defendant and Taylor, and the abandonment of Taylor beneath the house.  Defense counsel sought to undercut the prosecutor's portrayal of his client, describing him as a "[m]arginally retarded" individual who had been taken advantage of by Taylor. However, after suggesting that the facts were embellished by the prosecutor, defense counsel went on to say:

> "However, what the evidence will show, and you should prepare yourselves, will be a descent into obscure obsolescence of the abnormal psychology variety. This is a case of homosexual behavior and alcoholism. That's really what the case is about, and certainly when the [c]ourt, His Honor, Judge Brassard, asked you about homosexual behavior and that variety, he said, well, it may contain the evidence the way it is. I mean, that is the behavior of gay, homosexual men. . . . Anyway, for whatever disconcerting and sexual behavior you will hear -- and it

---

[17] The word "homosexual" was used by counsel and the judge at trial.  We quote the term when so used, noting that the word, by contrast to "gay" or "same sex," may carry a negative connotation for some.

is lewd, it is sometimes open and lascivious in public. <u>It is disgusting, obscene, you know, beyond reason even of any heterosexual act when in public</u>. But in private, it is what it is. However, with any of those acts, it never broke up the couple. They were bombed out of their minds in Braintree, in East Boston, in Revere, in Quincy, a lot." (Emphasis added.)

In his closing argument, defense counsel again returned to this theme, asking the jury not to be distracted by the testimony concerning sexual conduct, and to focus solely on the murder charge. However, as he did in his opening statement, defense counsel continued to make additional remarks.

"Ladies and gentlemen of the jury, when I made an opening statement to you <u>I told you that we would be descending into the depravity area of the world into some form of abnormal psychology</u>. Well, we did and certainly a lot of that is propelled by the evidence proffered by the government. <u>And there was a lot of, you know, lewd, lascivious, florid, obscene behavior</u>. And they brought it out anyway. . . .

"And we've heard, well, every part of the disparaging aspect of it all that we could see. <u>Trying to make Mr. Lacoy a demon. Loathsome, diabolical, malevolent, horrible, horrible, evil. It has nothing to do with the elements of homicide. Not all. They know it. Shoved it into your face anyway. Please, don't fall for that. Don't fall for that</u>. It's a common sense case, please, got to get it out of your mind. It's for another day. Today, it's homicide. It's about the story in the bedroom." (Emphasis added.)

"[T]he burden of proving ineffectiveness rests with the defendant." <u>Commonwealth</u> v. <u>Kolenovic</u>, 471 Mass. 664, 673 (2015) (<u>Kolenovic</u>), quoting <u>Commonwealth</u> v. <u>Montez</u>, 450 Mass. 736, 755 (2008). "Counsel is ineffective where his conduct falls 'below that which might be expected from an ordinary

fallible lawyer' and prejudices the defendant by depriving him 'of an otherwise available, substantial ground of defence.'" Commonwealth v. Lavoie, 464 Mass. 83, 89 (2013), quoting from Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  In assessing the second prong of Saferian, "a defendant is entitled to a new trial 'if we have a serious doubt whether the result of the trial might have been different had the error not been made.'" Millien, 474 Mass. at 432, quoting from Commonwealth v. Azar, 435 Mass. 675, 685 (2002).

It is evident even from the bare record that counsel's choice was a tactical one.[18]  Faced with the likelihood that the relationship between the two men, the sexual assaults, and the abandonment of the dying Taylor would all come in to evidence, defense counsel made a tactical decision to try to deflate those arguments from the beginning, and again at the end, with his admonition not to "fall for that."[19]  See Commonwealth v.

---

[18] Although we disfavor claims of ineffective assistance on direct appeal of a defendant's conviction, there is a narrow exception for a "claim of ineffective assistance [which] may be resolved on direct appeal . . . when the factual basis of the claim appears indisputably on the trial record."  Commonwealth v. Zinser, 446 Mass. 807, 811 (2006) (quotation and citation omitted).  Compare Commonwealth v. Lane, 462 Mass. 591, 598-599 (2012).

[19] The Commonwealth had also suggested during the course of the motions in limine that it would consider introducing evidence of sex in public places.  Counsel also anticipated that evidence in his opening statement, but did not return to it in closing argument, because no such evidence was admitted.

Beauchamp, 49 Mass. App. Ct. 591, 612 (2000) ("Counsel's opening was a reasonable strategy in light of his realization that the Commonwealth would inevitably make the jury aware of that testimony")  Cf. Commonwealth v. Durakowski, 58 Mass. App. Ct. 92, 93 (2003) ("a defendant is not necessarily deprived of a defense when some guilt is conceded").

"Where, as here, the defendant's ineffective assistance of counsel claim is based on a tactical or strategic decision, the test is whether the decision was manifestly unreasonable when made."  Kolenovic, supra at 674 (quotations and citation omitted).  While the strategic decision itself may have been a reasonable one, we understand the argument on appeal to be that the manner of making the argument was manifestly unreasonable, because it indulged in gross and discriminatory stereotype, and was condemnatory of the defendant.  We do not condone presentation of incompetent generalizations and baseless, florid characterizations that did not have, and would not reasonably be expected to have, any factual basis in the evidence.  See Mass. R. Crim. P. 24, 378 Mass. 895 (1979); Reporters' Notes to Rule 24, Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, at 1605-1606 (LexisNexis 2015).  See also Mass. G. Evid. § 1113 (a)(1) (2016), and Note, citing Commonwealth v. Fazio, 375 Mass. 451, 454 (1978), and Commonwealth v. Croken, 432 Mass. 266, 268 (2000).  However, even if we assume that this much of the

strategic judgment regarding the manner of presentation was manifestly unreasonable when made, the evidence was quite simply overwhelming.  The defendant's prior recorded statements, his emails, his efforts to cover up and mislead, and his admissions at trial provided ample basis for the conviction, and we do not have a serious doubt as to whether the result of the trial would have been different if the offending statements had not been made.[20]

3.  Prior bad acts.  The defendant contends that the judge erred in allowing the Commonwealth to admit evidence of prior bad acts that showed that the defendant had sexually assaulted Taylor on several occasions.  The defendant points to four instances of prior bad acts:  (1) about one year before the

_____

[20] Relying on United States v. Cronic, 466 U.S. 648, 659 (1984), the defendant asserts that no showing of prejudice is required because counsel's performance was so deficient as to create a conflict of interest and deprive him of counsel.  See Commonwealth v. Mosher, 455 Mass. 811, 819 (2010) (no showing of prejudice required under art. 12 where counsel has a conflict of interest).  Constructive deprivation of counsel based on a conflict of interest is narrowly construed.  Id. at 820.  Counsel here had no conflict of interest as the cases define it, participated fully in the trial, cross-examined witnesses, and presented a defense.  This is not a case of "[a]ctual or constructive denial of the assistance of counsel altogether."  Perry v. Leeke, 488 U.S. 272, 280 (1989), quoting Strickland v. Washington, 466 U.S. 668, 692 (1984).  Nor is it a case where counsel was sleeping or absent, or where there was "a complete failure to subject the prosecution's case to adversarial testing."  Scarpa v. Dubois, 38 F.3d 1, 12 (1st Cir. 1994) (and cases cited).  Counsel did not "align[] himself with the prosecution against his own client."  Rickman v. Bell, 131 F.3d 1150, 1159 (6th Cir. 1997).

killing, the defendant "attempted to open the person's pants" while that person was sleeping, and that person "woke up, screaming and yelling, I'm not gay, you don't do that, I'm not into that"; (2) the defendant "knew [that Taylor] was a [heterosexual] guy but he liked having sex with [Taylor]" anyway; (3) the defendant's admission on cross-examination that on several occasions he had sexually assaulted Taylor after Taylor had "blacked out" from drinking excessively; and (4) the underwear that was found on Taylor's corpse was torn on the backside.[21]

"Evidence of a defendant's prior . . . bad acts is inadmissible for the purpose of demonstrating the defendant's bad character or propensity to commit the crimes charged. . . . However, such evidence may be admissible . . . 'to establish motive, opportunity, intent, preparation, plan, knowledge,

---

[21] Although these evidentiary issues were addressed in various motions in limine, the only objection made at trial concerning this prior bad acts evidence was an objection to the admission of photographic evidence depicting the torn underwear. Therefore, the defendant's arguments as to the other prior bad acts evidence have been waived, and we review for error and, if error, for a substantial risk of a miscarriage of justice. See Commonwealth v. Whelton, 428 Mass. 24, 25 (1998) ("a motion in limine, seeking a pretrial evidentiary ruling, is insufficient to preserve appellate rights unless there is an objection at trial"). We note that this rule of preservation has been changed for cases tried since the issuance of Commonwealth v. Grady, 474 Mass. 715, 719 (2016) ("Going forward, . . . [w]e will no longer require a defendant to object to the admission of evidence at trial where he or she has already sought to preclude the very same evidence at the motion in limine stage").

identity, or pattern of operation.'"  Commonwealth v. Crayton,
470 Mass. 228, 249 (2014) (Crayton), quoting from Commonwealth
v. Walker, 460 Mass. 590, 613 (2011) (Walker).  "Other bad acts"
evidence should be excluded where "the risk of unfair prejudice
outweighs its probative value."  Crayton, supra at 249 n.27.

Before trial, the Commonwealth moved to admit the evidence
to show the relationship between the defendant and Taylor.  The
Commonwealth argued, and the judge agreed, that the evidence
that the defendant sexually assaulted Taylor and may have
sexually assaulted another individual, was relevant to the
defendant's state of mind and intent, and was not unduly remote.
The evidence was directly relevant to the Commonwealth's theory,
namely that the defendant was angry at Taylor for "leeching" off
him and for refusing to engage in consensual sex with him, and
to rebut the defenses of self-defense and accident.  See
Commonwealth v. Butler, 445 Mass. 568, 574-575 & n.6 (2005) (and
cases cited) (hostile nature of relationship).  Cf. Commonwealth
v. Sharpe, 454 Mass. 135, 144 (2009) (Sharpe) (evidence of abuse
of a former girlfriend admissible in first degree murder case of
current girlfriend to show pattern of hostility based on
arguments over money and progression of violence).[22]  The judge

---

[22] With respect to the evidence of the assault on an
unidentified person, neither party argued this evidence to the
jury, and the jury were not informed whether the person was
Taylor or a third party.  For the reasons stated in Sharpe, the

clearly instructed the jury regarding the proper use of the evidence on two occasions, i.e., during the presentation of the evidence and before deliberations. "We leave to the judge's sound discretion whether the probative value of the evidence outweighs the risk of unfair prejudice. . . . and conclude that the judge did not abuse his discretion by admitting this testimony." Walker, supra at 613 (citation omitted).

4. Jury instructions. The defendant asserts that the judge erred by declining to give an instruction on sudden combat and on involuntary manslaughter. The judge instructed the jury on self-defense, accident, and manslaughter by reason of provocation and use of excessive force in self-defense.

Sudden combat has been described as follows: "[w]hen two meet, not intending to quarrel, and angry words suddenly arise, and a conflict springs up in which blows are given on both sides, without much regard to who is the assailant, it is a mutual combat. And if no unfair advantage is taken in the outset, and the occasion is not sought for the purpose of gratifying malice, and one seizes a weapon and strikes a deadly blow, it is regarded as homicide in heat of blood . . . ."

---

evidence was admissible to show the defendant's pattern and course of conduct. Additionally, the testimony was brief, no emphasis was placed on it by the Commonwealth in its closing argument, and the evidence paled in comparison to the defendant's explicit admission that he sexually assaulted Taylor when he had passed out.

*Commonwealth* v. *Rodriquez*, 461 Mass. 100, 107 (2011), quoting from *Commonwealth* v. *Webster*, 5 Cush. 295, 308 (1850). The defendant's testimony, that Taylor attacked him and then "fell" into the knife by "accident," was inconsistent with a theory of sudden combat. See *ibid*.

"Involuntary manslaughter is an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct." *Commonwealth* v. *Life Care Centers of America, Inc*., 456 Mass. 826, 832 (2010) (quotation and citation omitted). "Although our cases state frequently that the essence of wanton or reckless conduct is intentional conduct, . . . reckless conduct does not require that the actor intend the specific result of his or her conduct, but only that he or she intended to do the reckless act. . . . Accordingly, when we refer to the intent required to support a conviction of involuntary manslaughter, we refer to the intent to perform the act that causes death and not the intent that a death occur." *Ibid*. (citations and quotations omitted). As the judge noted at trial, the defendant testified that he did not intend to stab the victim. This testimony supported the defense of accident, but did not form the basis for asserting that he engaged in conduct which involved a high degree of likelihood that substantial harm will result to another. *Id*. at 836 ("the

crime of involuntary manslaughter requires an act taken in disregard of a high probability of harm to others so that the act is wanton or reckless").

There was no error in declining to give the instructions.

<u>Judgment affirmed</u>.